**Tameka Nichole MARTIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 14–06–00724–CR.**

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 13, 2007.

---

---

Frances M. Northcutt, Houston, for appellant.

Carmen Castillo Mitchell, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

## OPINION

JOHN S. ANDERSON, Justice.

A jury found appellant, Tameka Nichole Martin, guilty of the brutal capital murder of her ten-month-old baby girl. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8) (Vernon 2003). The trial court assessed punishment at incarceration for life in the Texas Department of Criminal Justice, In-stitutional Division. In four issues, appellant challenges the legal and factual sufficiency of the evidence, the trial court's failure to charge the jury on the lesser included offense of injury to a child, and the trial court's admission of expert testimony regarding appellant's intent. Appellant also requests correction of the judgment's recitation of punishment because it improperly reflects that the jury assessed punishment. It is clear from the record the judge assessed appellant's punishment; therefore, we modify the judgment to reflect that the judge, not the jury imposed punishment.[1] We affirm the judgment as modified.

### FACTUAL AND PROCEDURAL BACKGROUND

At approximately 6:30 a.m. on Monday, September 8, 2003, appellant woke up her ten-month-old infant, D.D., and noticed D.D.'s eyes were swollen. Concerned about D.D.'s condition, appellant called her mother, Elaine Sanders, at work and told her D.D. was sick and needed to go to the hospital. Sanders told appellant she was unable to get off work. Appellant also spoke with Willie Mae Cains, D.D.'s paternal grandmother, who worked with Sanders. Cains told appellant to call 9–1–1, and appellant informed Cains she would take D.D. to the hospital. Instead of calling 9–1–1, appellant called her grandmother, and her grandmother told her to put Vaseline on the baby's eyes. At some point, appellant also called her aunt and asked her aunt for a ride to the hospital. Around 7:30 that morning, the daycare bus came to pick up D.D., and appellant informed the driver D.D. would not be attending daycare that day. Appellant had no explanation for why she did not ask the daycare bus to take her to the hospital

---

1. It appears the mistake on the judgment was simply a matter of someone circling the wrong word on the judgment form.

other than she did not think D.D.'s injuries were too serious. Appellant continued to wait for her aunt to pick her up.

Around 1:00 or 1:30 p.m., Billy Davis, D.D.'s father, arrived at appellant's apartment. Cains called Davis earlier that morning and told him to go check on D.D. Because of her earlier conversation with appellant, Cains told Davis D.D. was at a hospital, so Davis rushed to two different hospitals before learning D.D. was still at appellant's apartment. Immediately upon arriving at appellant's apartment, Davis noticed D.D.'s eyes were swollen, one of her eyeballs looked crooked, and she was not responding. Davis attempted to call 9–1–1, but appellant grabbed the phone out of his hand. Davis then went to a neighbor's apartment, asked to use her phone, and called 9–1–1.

Don Larson, Senior Captain with the Houston Fire Department, arrived on the scene at 1:38 p.m. Larson arrived before the ambulance, so he briefly assessed D.D.'s condition. Larson testified D.D. was lethargic, moving slowly, her eyelids were swollen, and she did not feel feverish. Larson testified he did not take the baby's diaper off or pick her up. He also testified he found no outward signs of trauma, but admitted closed head injuries were often hard to see. Larson also testified it is often more difficult to notice bruises on a dark-skinned baby. When the ambulance arrived, Larson turned the patient care over to the paramedic.

Daniel Caballero, a paramedic with the Houston Fire Department, arrived on the scene around 1:42 p.m. Upon arriving at the scene, Caballero assessed the baby. Caballero testified he did not notice any trauma on the baby in the form of big bruises, deformities, or bleeding. He testified the baby was breathing a little fast, her skin was warm and dry, her heart beat was normal, and her response to stimuli

seemed normal. Caballero testified he took off D.D.'s diaper to check for injuries and he did not notice anything unusual. He also testified he did not notice any bruises on D.D. or redness near her vaginal area and around her nose. It was not until the hospital nurse pointed it out to him that Caballero noticed the bruises on D.D.'s forehead and pelvis and her deviated eye. Caballero also testified no person at the scene could have realized D.D. had head trauma, and there was nothing obvious to him indicating something was substantially wrong with the baby. However, Caballero admitted on direct examination this was his first baby case and he did not feel confident. He also admitted on redirect the baby's position in her car seat, the color of her skin, and the lighting in the apartment could have all been factors in why he missed some of her injuries.

After arriving at the scene, Caballero and another paramedic transported D.D. to the hospital. Caballero testified appellant did not act as if she was in a hurry to get to the hospital. He testified appellant did not request to sit in the back of the ambulance with D.D., but instead she sat in the front seat talking and laughing with the driver. Caballero also testified on the way to the hospital he attempted to ask appellant some additional questions about D.D.'s history and appellant became angry with him.

D.D. arrived at the Texas Children's Hospital around 2:40 p.m. and spent approximately two hours in the emergency center. The hospital then moved D.D. to the Pediatric Intensive Care Unit. Four days later, on September 12, 2003, D.D. died of craniocerebral trauma.

Dr. Coburn Allen was the attending physician in the emergency center at Texas Children's Hospital the afternoon D.D. was admitted. Dr. Allen testified when he first saw D.D. she was actively seizing,

grossly abnormal, and only responding to painful stimuli. He testified D.D. had obvious bruising on her forehead, her scalp, her nose, her upper thigh, and her inguinal groin area. In addition, D.D.'s eyes were deviated. Dr. Allen testified based on D.D.'s symptoms he immediately suspected she had a serious head injury, so he placed D.D. on a ventilator.

While Dr. Allen cared for D.D. in the emergency room, another doctor conducted the primary interview with the family to determine D.D.'s past medical history. During the initial interview, appellant told the doctor she did not know what happened to D.D. and that she just found her in that condition. Dr. Allen later spoke with appellant in the emergency room, and he testified appellant appeared disinterested in her child and aloof. He testified the way appellant was whispering on her phone was very bizarre to him, and his gut instinct was she was developing her story.

Sometime after being admitted to the emergency room, Dr. Allen sent D.D. to have a CT scan. Dr. Allen testified the CT scan revealed D.D. had significant trauma to the left side of her brain. He testified the left side of the brain was swollen and pushing over onto the right side, which is called herniation. Dr. Allen also testified this type of injury was highly inconsistent with a minor head injury. Instead, he testified this type of accident was similar to crashing in a high speed motor vehicle accident, falling from a roof, or being hit with a baseball bat. Dr. Allen testified these types of injuries would cause the child to be profoundly sleepy, and it would be shocking if a child was able to eat or even wake up after such trauma. Dr. Allen stated he "[could not] imagine anyone [who was] able to hear and speak and talk and walk that would not recognize a child like this to be terribly abnormal and very, very unresponsive."

In addition to the trauma to her brain, D.D. suffered trauma to her body as well. Dr. Allen testified D.D. suffered from malnutrition and multiple broken bones. After conducting x-rays, Dr. Allen discovered D.D. suffered from a fresh femur fracture on top of an old femur fracture. The femur fractures were categorized as spiral fractures, which are most often caused by severe jamming or twisting of the leg. He explained that this type of femur fracture occurs in accidents such as a severe motor vehicle crash. Dr. Allen testified this type of fracture on a child is highly consistent with child abuse. Also, D.D. suffered from multiple fractures in her arms and shoulders. Dr. Allen testified these types of injuries were very rare and were typically caused by a high amount of force. During trial, Dr. Allen used a baby doll to demonstrate the amount of force necessary to cause the type of broken bones D.D. suffered.

When asked his opinion, Dr. Allen testified D.D. "was a severely beaten child that died." Dr. Allen testified the injuries were "all high speed, high velocity injuries, which were directly intended to hurt [the] child." Dr. Allen testified the retinal hemorrhages, the multiple broken bones, and the types of fractures suffered were all indications of intentionally inflicted injuries. He also testified whoever killed D.D. would have immediately known she was severely injured. According to Dr. Allen, the symptoms of being severely lethargic or comatose, not responding appropriately, seizing, and perhaps vomiting would have occurred almost immediately from the time of injury. Dr. Allen further testified in the vast majority of cases a child suffering from these types of head injuries would be highly symptomatic within four to six hours, with the vast majority occurring in the first hour. On cross-examination, Dr. Allen admitted he could not pin-

point exactly when the incident occurred, but he restated his opinion regarding the four to six hour window of time when the symptoms most likely would have appeared.

Dr. Allen also testified to his opinion of how D.D. was injured. He testified the retinal hemorrhages D.D. sustained were a classic condition in shaken baby syndrome, but shaking did not explain all of the injuries D.D. suffered. In addition, Dr. Allen opined that the obvious bruising to the scalp with the associated contusion to the left side of the brain was "consistent with blunt trauma hitting on the counter surface, hitting with a hand, hitting with an object, [or] throwing on the floor." Dr. Allen testified the child was basically beaten to death. On cross-examination, however, he admitted appellant's lack of explanation for what happened to D.D. was consistent with both child abuse and with appellant truly not knowing what happened.

During trial, Dr. Lorna Gonsulan, the assistant medical examiner at the Harris County Medical Examiner's Office, also testified regarding the injuries suffered by D.D. and her cause of death. Dr. Gonsulan testified the major finding relating to the death was a subdural hemorrhage in the brain, which occurs when the space between the brain and the dura bleeds. In addition, D.D. had swelling in her brain, retinal hemorrhages, and subarachnoid hemorrhages. This combination of injuries is often referred to as craniocerebral trauma or blunt force trauma to the head. Dr. Gonsulan also reviewed the x-rays and testified D.D. had a preexisting injury to her femur which was in the process of healing and a fresh spiral fracture to the same bone. She testified a spiral fracture was a common injury in child abuse. In addition, Dr. Narula, the medical examiner who conducted the autopsy, reserved tis-

sue from the bone of D.D.'s left shoulder. Dr. Gonsulan dissected the tissue and observed D.D.'s left scapula had a fresh fracture as well. Dr. Gonsulan further testified she found a hemorrhage on D.D.'s neck, which supports the evidence that D.D. was subjected to severe blunt force trauma. Dr. Gonsulan did admit it was difficult to distinguish which injuries were a result of medical intervention on the part of the hospital and which injuries were present when D.D. entered the hospital, but she also testified the emergency room physicians, such as Dr. Allen, would be a more reliable source regarding what injuries D.D. had upon entering the hospital.

Dr. Gonsulan testified to her opinion regarding the effect of D.D.'s injuries. She opined that injuries of the nature D.D. suffered would have caused instant loss of consciousness. She testified the child would not have cried, woken up, or taken a bottle after enduring such trauma but, instead, would have been immediately unresponsive. On cross-examination, Dr. Gonsulan admitted she could not specifically say how the injuries occurred; however, she testified D.D.'s injuries were consistent with someone shaking the child and/or slamming the child against an object, striking the child with an object, or striking the child with a hand.

On the day D.D. was admitted to the hospital, Mary Lawrence, a social worker at Texas Children's Hospital, interviewed appellant. Lawrence testified at trial regarding the statements made by appellant. According to Lawrence, appellant told her she put D.D. to bed around 9:30 p.m. on Sunday night and at that time, D.D. had no problems. At around 2:30 a.m., D.D. woke up and appellant fed her. D.D. woke up again around 5:15 a.m., and appellant changed her diaper. At approximately 6:30 a.m., appellant woke D.D. up and noticed her eyes were swollen, so she de-

cided not to send D.D. to daycare. Appellant then called her mother. Appellant told Lawrence no other person was responsible for D.D. on Saturday or Sunday. Appellant also told Lawrence her friend Marcus came to the apartment for about one hour on Sunday but he was never alone with D.D. Appellant said Marcus was a friend and she did not know his last name. In addition, appellant said she called Cains and Cains told her to call 9–1–1. According to appellant, she was waiting for her aunt to come pick her up and take her to the hospital when D.D.'s father showed up and called 9–1–1. Appellant could not provide Lawrence with any explanation for how D.D. was injured. Lawrence testified she observed appellant's demeanor during her time at the hospital and at times appellant appeared tearful but at other times Lawrence observed appellant laughing on the telephone. In contrast, Lawrence testified D.D.'s father, Davis, appeared very concerned about D.D.

Later that evening, after appellant's interview with Lawrence, Sergeant William Booth and Officer Connie Park, both from the Houston Police Department, took appellant to the station to make a statement. The statement was taped and later transcribed into a written statement. Booth testified regarding the statement appellant made, the audio tape was played for the jury, and the written transcript was introduced into evidence. Appellant's statement to the police was inconsistent with her statement to Lawrence in many respects. In her statement, appellant told the investigating officers Marcus Green came over on Sunday evening, and she left D.D. with him for around three hours so she could do her laundry and run errands. When appellant returned, Green told her D.D. had thrown up because she had some bad milk, so appellant woke D.D. up and changed her shirt. Appellant told the officers she did not notice anything wrong

with D.D. at this time. According to appellant, Green spent the night with her Sunday evening, but he left the apartment around 10:00 p.m. and returned around 3:00 or 4:00 a.m. Appellant also told the officers D.D. slept in the bed with her and Green, and D.D. woke up twice during the night, once at 1:30 a.m. and again around 5:30 a.m. Appellant told the officers Green left the apartment while she was waiting for a ride to the hospital, but did not ask for a ride with Green because the woman who picked Green up did not like her. According to appellant, Green came back to the apartment shortly before the ambulance arrived. In addition, appellant told the officers Davis arrived at her apartment around 1:00 p.m., and she did in fact take the phone away from him because she believed he was calling his mother. She stated she could see the numbers Davis was dialing and it was not 9–1–1. Appellant also stated she did not call 9–1–1 because she did not think D.D.'s condition was that serious.

During trial, Cains testified appellant often wanted Davis to watch D.D. and would get mad if he refused. According to Cains, on more than one occasion, appellant told her if Davis did not come and pick up D.D. she would throw the baby in the bathtub and drown her. On the morning of September 8, Cains testified appellant sent a 9–1–1 message to her mother, who Cains worked with, telling her D.D.'s eyes would not open. Cains spoke with appellant and told her to call 9–1–1. Cains testified she could hear D.D.'s voice in the background and it was very weak. Cains testified appellant acted very calm on the phone. Around 12:30, Cains learned appellant had not gone to the hospital yet, so she called Davis and told him the situation. Later that afternoon, Davis called Cains and told her D.D. had been taken to Texas Children's Hospital. Cains testified while

she was on her way to the hospital, appellant called her and told her "it didn't look good" and not to bring Davis or she would "bust him in the face." Also, Cains testified while they were all waiting in the emergency room, she observed appellant laughing and talking on her cell phone. After D.D. passed away, Cains testified she spoke with appellant and appellant told her D.D. must have been injured at daycare. Cains testified that sometime later, appellant told her someone at the hospital probably hurt D.D.

Davis testified D.D. cried a lot and it often got on appellant's nerves. He testified appellant would call Davis asking him to pick up D.D., and on three occasions, appellant said if he did not pick D.D. up she was going to throw her in the bathtub and drown her. Davis also testified on Friday, September 5, appellant called him and asked if he would keep D.D. because she wanted to go out. Davis refused to keep D.D. because he was watching appellant's other child, Delvan, at the time. According to Davis, when he arrived at appellant's apartment on Monday, he immediately noticed D.D. was incoherent and her eyes were slightly deviated and swollen. Davis testified he immediately grabbed the phone to call 9-1-1, but appellant jerked the phone out of his hands. Davis testified appellant was cussing and yelling "[y]ou're not fixing to send those people to my house. And if they come, I'm not opening the door for them." At that time, Davis ran to the neighbor's apartment and called 9-1-1. In addition, Davis testified he observed appellant in the hospital room with D.D. and "she wasn't even looking at [the] baby. [She] [w]asn't even paying attention to her." On cross-examination, Davis denied ever telling appellant's grandmother that appellant did not injure D.D., and denied ever asking appellant's aunt where appellant's boyfriend lived.

Marcus Green, appellant's boyfriend, testified he moved in with appellant for a couple of weeks, but he moved out because the two argued too often. Green testified on two occasions he overheard appellant tell Davis if he did not pick up the kids, she would drown them. Green further testified that on one occasion appellant actually went to the bathroom and began running the water. Green followed appellant into the bathroom and took the stopper out of the tub. Green admitted during trial he did not initially tell the police about the bathtub incident because he did not want to be involved. Green's mother encouraged him to tell the police everything, so he later contacted the prosecutor.

Green also testified D.D. cried often and appellant often ignored her. Green testified on Sunday evening he went to appellant's apartment, and appellant asked him to watch D.D. While he was watching D.D., she spit up, so he changed her shirt and put her back to bed. According to Green, when appellant returned she changed D.D.'s shirt again and put D.D. in the children's room to sleep. Green testified after the baby went to sleep, he did not see or hear her again until the next morning. Green testified he spent the whole night at appellant's apartment and he could not remember whether appellant got up during the night; however, Green admitted he most likely would not have woken up even if appellant did get up to check on D.D. The next thing Green remembered was appellant waking him up and telling him about D.D.'s eyes. Green remembers D.D.'s eyes being swollen and one looking a little crossed. Green testified he never left appellant's apartment Monday while appellant was waiting for an ambulance. Green denied ever hurting D.D., twisting or pulling her leg, jerking her arms, or ever getting really angry with her. Green

testified D.D.'s crying did not get on his nerves.

Roslyn Gibson, the service coordinator and property manager for appellant's apartment complex, was at the apartment complex the day the ambulance took D.D. to the hospital. Gibson testified she was talking with Hattie Holcombe, a resident of the complex, outside of Holcombe's apartment Monday afternoon when a young man approached them and asked to use Holcombe's telephone. Gibson testified the man called 9–1–1 and then left. After seeing the ambulance arrive at the complex, Gibson went over to appellant's apartment. Gibson testified she entered appellant's apartment and overheard appellant telling someone on the phone "there [was] nothing wrong with the baby." Gibson testified she checked on the baby, and immediately upon seeing her, she noticed D.D. was not responding and her eyes were rolling back in her head. In addition, Gibson testified after the paramedics put D.D. in the ambulance, they had to sound the sirens to get appellant to come out of the apartment. According to Gibson, appellant came into the office after D.D. died and did not appear tearful or emotional. Appellant told Gibson she did not know how the baby died.

Sanders, appellant's mother, testified appellant called her at work Monday morning and told her D.D. was not feeling well so she needed to go to the hospital. Sanders testified appellant sounded calm on the phone and that the situation did not sound too serious. According to Sanders, she was unable to get off work that day, so she could not take appellant to the hospital; however, Sanders's boss testified she told Sanders she could leave work immediately and seek help for the baby. Sanders also testified appellant was emotional at the hospital and seemed concerned for D.D. Sanders testified no one at the hospital informed her family of the seriousness of D.D.'s condition. Sanders testified it was not until later Monday night that Cains informed them of D.D.'s critical condition. On cross-examination, Sanders denied making several statements which were included in her police statement.

Appellant testified during trial as well. Her story regarding the night in question was, in many respects, similar to her police statement. However, at trial, appellant testified D.D. woke up twice during the night, and the second time she woke up, appellant fed D.D. a little milk. Appellant testified she did not notice the bruises on D.D. nor did she realize how critical D.D.'s injuries were, so she did not call 9–1–1. Appellant also testified she jerked the phone out of Davis's hand because she thought he was calling his mother; however, on cross-examination appellant admitted she lied to the police when she told them she could read the numbers Davis was dialing. Appellant denied making any statements about drowning D.D. in the bathtub and denied ever hurting her baby. Appellant testified Green was the person who hurt D.D. However, appellant also testified D.D. was responding normally as late as 1:15 or 2:30 Monday morning and that Green did not hurt the baby from 9:00 Sunday night to 6:30 Monday morning.

Throughout the trial, a past incident regarding D.D.'s leg was another significant issue. According to several workers from Peterson's Child Care Development, the daycare D.D. attended, they noticed something wrong with D.D.'s leg approximately three weeks before D.D. died. Nasreen Kahn testified when she went to change D.D.'s diaper, she noticed something was wrong with D.D.'s left leg. D.D. would cry when she touched her left leg. Also, when D.D. would pull up in her crib, she would hold her left leg up. Both Kahn and T–Etta Gayles testified a note was sent home

in the baby's diaper bag to inform appellant. Kahn testified D.D. came back the next day and her leg was still hurt, so she once again informed Gloria Anderson, the supervisor and appellant's aunt, and Anderson told her to ignore it. At some point, according to Gayles, appellant informed the daycare she had taken D.D. to the doctor and nothing was wrong with D.D.'s leg. Anderson testified appellant brought a yellow slip of paper from the doctor to the daycare which stated D.D.'s leg was fine; however, this slip of paper was missing from the daycare files.

According to appellant, she received the note from the daycare regarding D.D.'s leg. Appellant testified she took D.D. to the emergency room at the Doctor's Hospital and told the triage nurse D.D. had a cold, a cough, and a hurt leg. Appellant testified she saw the nurse write D.D.'s symptoms on her chart. In addition, appellant testified she asked the doctor to take x-rays of D.D.'s leg. In her statement to the police, appellant told the officers the hospital took x-rays of D.D.'s leg and informed her nothing was wrong with it. Hattie Martin, appellant's grandmother, testified appellant told her about the note from daycare, and she helped appellant find a ride to the hospital that same night. Martin also testified appellant received a note from the doctor, which she took to the daycare center the next day.

However, no hospital records existed confirming appellant's testimony. Christy Martin, the assistant director of medical records at the Doctor's Hospital, testified she generated a summary of every visit D.D. made to the hospital. According to Martin, D.D. did visit the hospital on August 15, 2003, but her only symptoms were fever, cough, and congestion. Melanie Cannon, a triage nurse at the Doctor's Hospital, attended to D.D. on August 15, 2003. Cannon testified appellant's chief complaints were fever, cough, and congestion. Cannon testified she would have documented it had appellant mentioned anything regarding D.D.'s leg. Cannon did admit on cross-examination she did a general assessment of D.D. and did not notice any pain in D.D.'s leg. Dr. Rolando Diaz, the doctor who attended to D.D. on August 15, testified he also asked appellant what was wrong with D.D., and she did not mention anything regarding D.D.'s leg. Dr. Diaz also testified he never ordered x-rays for D.D.'s leg. In response to this testimony, appellant and her family insisted certain records from the hospital containing appellant's complaint about D.D.'s leg were missing.

The State also called witnesses to impeach appellant's credibility. Trishina Houston testified she knew appellant back in 1999, and in her opinion, appellant was a violent person. According to Houston, appellant and four or five other girls jumped Houston and beat her up because appellant thought Houston said something bad about a guy. John Joseph Lain, a police officer, testified he was familiar with appellant prior to September 8, 2003, and in his opinion, appellant was not a truthful person. Additionally, throughout the trial, the jury heard evidence that appellant was convicted of family violence against Davis in January 2002 and convicted of theft by check and theft under $50.00 in 2006.

The jury found appellant guilty of capital murder, and the trial court sentenced appellant to incarceration for life. This appeal followed.

## DISCUSSION

### A. Did the Trial Court Err in Allowing Dr. Allen to Testify Regarding the Perpetrator's Intent?

In her fourth issue, appellant contends the trial court reversibly erred when it

allowed Dr. Allen to testify regarding the perpetrator's intent. More specifically, appellant argues Dr. Allen was not qualified to give an expert opinion regarding a perpetrator's state of mind, and Texas courts have traditionally rejected any attempt to testify to a perpetrator's mental state. Because appellant challenges the legal and factual sufficiency of the evidence supporting the verdict, we must first resolve this threshold issue involving the admission of Dr. Allen's testimony as it may affect the sufficiency analysis.

### 1. Standard of Review

■ An appellate court reviews a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Burden v. State,* 55 S.W.3d 608, 615 (Tex.Crim.App.2001). An abuse of discretion will be found only when the trial judge's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *Cantu v. State,* 842 S.W.2d 667, 682 (Tex.Crim.App.1992).

### 2. Analysis

During Dr. Allen's testimony, he opined that whoever injured D.D. intended to hurt her. The relevant portion of the testimony is as follows:

Q: (By Ms. Munier) Is there any way that the person, whoever did this—to the baby, that they did not mean to cause this baby's death?

A: No.

MS. SCARDINO: Your Honor, that's also outside his range and calls for speculation.

THE COURT: Overruled. Your question is did they intend to cause the death of the child?

MS. MUNIER: Yes, sir.

THE COURT: Okay. I'm going to let him answer that if he has medical expertise—he is an expert—and if he has an opinion on that.

THE WITNESS: These are all high speed, high velocity injuries, which were directly intended to hurt this child.

Q: (By Ms. Munier) To kill this child?

A: To kill this child, to do as much bad things to this child as it could. This was not a minor punishment of this child. This is severe rage.

■ We must first address the State's contention that appellant failed to preserve this complaint for appeal. During trial, appellant's counsel objected by arguing the doctor's testimony was "outside his range" and "would call for speculation." The State argues these objections are not sufficient to preserve a complaint regarding Dr. Allen's qualifications as an expert or regarding the testimony's reliability and relevance. We disagree.

■ To preserve error for appellate review, the complaining party must make a timely and specific objection at the earliest possible opportunity. *See* Tex.R.App. P. 33.1; *Armstrong v. State,* 718 S.W.2d 686, 699 (Tex.Crim.App.1985), *overruled on other grounds by Mosley v. State,* 983 S.W.2d 249 (Tex.Crim.App.1998). The generally acknowledged policies of requiring specific objections are twofold. First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it. *Neal v. State,* 150 S.W.3d 169, 178 (Tex.Crim.App.2004) (citing *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim.App. 1977)). Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony. *Id.* (citing *Zillender,* 557 S.W.2d at 517). We believe the "outside his range" objection was sufficient to put the trial court and opposing counsel on notice appellant was challenging Dr. Allen's credibility as an expert and the relia-

bility of his testimony. As evidence of this, we look to the record where the court responded to the objection by stating "I'm going to let him answer that if he has medical expertise—he is an expert—and if he has an opinion on that." We hold appellant lodged an adequate objection and presented this issue for appellate review.

█ Appellant's first argument regarding Dr. Allen's testimony is that he was not qualified to testify as an expert regarding a perpetrator's state of mind. Rule 702 of the Texas Rules of Evidence provides "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. In deciding whether to admit expert testimony, the trial court must determine two things: (1) whether the witness is qualified as an expert, and (2) whether scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. *Powers v. State*, 757 S.W.2d 88, 93 (Tex.App.-Houston [14th Dist.] 1988, pet. ref'd). Additionally, Rule 704 states "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue." Tex.R. Evid. 704.

█ Dr. Allen was employed by the Baylor College of Medicine as an assistant professor of pediatrics. Dr. Allen testified he attended Baylor Medical School, attended a pediatric residency for three additional years, and then attended two fellowships for four years which was subspecialty training in pediatric infectious diseases and pediatric emergency medicine. Dr. Allen testified he was triple board certified in pediatrics, pediatric emergency medi-

cine, and pediatric infectious diseases. He also testified he had experienced hundreds of injuries similar to D.D.'s injuries and knew the injuries were generally consistent with child abuse. Based on Dr. Allen's knowledge, skill, experience, training and education, we conclude he was qualified as an expert in regard to whether the injuries presented were intentional and not accidental injuries. Tex.R. Evid. 702. Furthermore, whether the injuries were intentional or accidental involved scientific, technical, or other specialized knowledge and Dr. Allen's testimony assisted the jury in understanding the evidence and determining the fact at issue.

Appellant also argues Dr. Allen's testimony is inadmissible because Texas courts have traditionally rejected the attempt to offer any testimony, other than that of the accused, concerning the defendant's mental state at the moment he committed the crime. Appellant cites *Whitmire v. State, Williams v. State,* and *Winegarner v. State* to support her proposition; however, these cases are distinguishable from the facts in this case. In the three cases cited by appellant, the State attempted to admit the testimony of a psychologist or a psychiatrist regarding their opinion on the defendant's mental state at the time he committed the crime. *Winegarner v. State,* 505 S.W.2d 303, 305 (Tex.Crim.App. 1974); *Whitmire v. State,* 789 S.W.2d 366, 372 (Tex.App.-Beaumont 1990, pet. ref'd), *abrogated by McDonald v. State,* 911 S.W.2d 798 (Tex.App.-San Antonio 1995 pet. dism'd); *Williams v. State,* 649 S.W.2d 693, 696 (Tex.App.-Amarillo 1983, no pet.). Appellant is correct when she states Texas courts have traditionally rejected attempts to offer testimony of the accused's mental state; however, our research has shown these cases involve a psychologist, a psychiatrist, or a lay witnesses's opinion. *See Arnold v. State,* 853

S.W.2d 543, 547 (Tex.Crim.App.1993) (holding lay witnesses could not testify as to defendant's state of mind concerning willfulness); *Jackson v. State*, 548 S.W.2d 685, 692–93 (Tex.Crim.App.1977) (finding the trial court properly refused to permit a psychiatrist to testify regarding defendant's state of mind at the time of the alleged offense); *Avila v. State*, 954 S.W.2d 830, 841 (Tex.App.-El Paso 1997, pet. ref'd) (holding the trial court properly excluded an expert psychologist's testimony regarding appellant's mental state). In the majority of these cases, the witness evaluated the defendant after the crime occurred and attempted to testify that the defendant did or did not have the requisite mental state at the time he or she committed the crime. *See Jackson*, 548 S.W.2d at 692–93. The main emphasis in the majority of these cases focuses on the fact the witness lacks personal knowledge of the appellant's state of mind, and that, typically, the opinion is based on hearsay. *See Arnold*, 853 S.W.2d at 547; *Jackson*, 548 S.W.2d at 692–93; *Winegarner*, 505 S.W.2d at 305.

■ The facts in this case are distinguishable because we are dealing with a medical doctor who examined the injuries sustained by D.D. and testified about the extent of those injuries. Dr. Allen testified that based on his medical expertise and knowledge and considering the nature of the injuries, it was his medical opinion that whoever injured D.D. did so intentionally. Essentially, Dr. Allen testified the injuries inflicted were non-accidental injuries, and his determination was based on his medical expertise, his past experiences, his examination of D.D., and his treatment of D.D.'s injuries. The testimony at issue in this case is similar to testimony in cases resolved by other Texas courts of appeals. *See Montgomery v. State*, 198 S.W.3d 67, 82–83 (Tex.App.-Fort Worth 2006, pet.

ref'd); *Hernandez v. State*, 772 S.W.2d 274, 274–76 (Tex.App.-Corpus Christi 1989, no pet.); *McKinney v. State*, No. 01–89-00535-CR, 1990 WL 88582, at *3–*4 (Tex. App.-Houston [1st Dist.] June 28, 1990, pet. ref'd) (not designated for publication). In those cases, the appellate courts affirmed the admission of the testimony. *See Montgomery*, 198 S.W.3d at 83; *Hernandez*, 772 S.W.2d at 276; *McKinney*, 1990 WL 88582, at *4.

In *Montgomery*, appellant was convicted of capital murder of a child. *Montgomery*, 198 S.W.3d at 72. During trial, a pediatric doctor testified the person who committed the violent assault against the child would have been reasonably certain the baby would die. *Id.* at 83. On appeal, appellant complained the trial court erred in allowing an expert witness to testify to a legal conclusion. *Id.* at 82. The Fort Worth Court of Appeals held the doctor's training, experience, research, seminars, and periodicals qualified him as an expert and, therefore, his testimony was proper. *Id.* at 84.

In *Hernandez*, the appellant was convicted of murdering the victim with a knife. *Hernandez*, 772 S.W.2d at 275. During trial, the State called the Nueces County forensic pathologist and Nueces County medical examiner Joseph Rupp to testify. *Id.* During examination, the prosecutor asked Rupp whether, in his opinion, the wound to the victim's neck was inflicted intentionally or accidentally, and Rupp testified the wound was a deliberate cut. *Id.* Appellant argued on appeal the trial court erred in allowing this testimony because it embraced an ultimate issue. *Id.* The appellant in *Hernandez* also cited to *Williams* and *Winegarner* for support. *Id.* Ultimately the *Hernandez* court determined Rupp's testimony was admissible because *Williams* and *Winegarner* were distinguishable and according to Rule 704

of the Texas Rules of Evidence, testimony by an expert of an opinion that embraces the ultimate issue of fact is allowed. *Id.* at 275–76.

Finally, the First Court of Appeals issued an unreported case with similar facts, which we find persuasive. *See McKinney*, 1990 WL 88582, at \*1. In *McKinney*, appellant was convicted of injury to a child. *Id.* During trial, a medical doctor testified in his medical opinion the injuries inflicted on the child were done intentionally. *Id.* at \*3. Appellant argued on appeal this was error, and the First Court of Appeals disagreed. *Id.* at \*3–4. The court held the doctor was sufficiently qualified and under Rule 704 allowed to testify regarding an ultimate issue. *Id.* at \*4.

We find the analysis and holdings in these cases persuasive. Accordingly, under Tex.R. Evid. 702 and 704, we find Dr. Allen was qualified to render his opinion on the ultimate issue of whether D.D.'s injuries were intentionally inflicted. Tex.R. Evid. 702, 704. Therefore, appellant's third issue is overruled.

## B. Was the Evidence Legally Sufficient?

■ In appellant's first issue, she argues the evidence was legally insufficient to support the verdict of guilt. More specifically, appellant argues no evidence exists to prove appellant was the perpetrator of the crime and no evidence exists to prove the manner and means of death.[2]

### 1. *Standard of Review*

■ In a legal sufficiency review, we view all the evidence in the light most

favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Salinas v. State*, 163 S.W.3d 734, 737 (Tex.Crim. App.2005). The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex.Crim.App.1998). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex.Crim.App.1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex.App.-Houston [14th Dist.] 2005, pet. ref'd).

### 2. *Analysis*

■ A person commits capital murder if she intentionally or knowingly causes the death of an individual under six years of age. Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). The identity of the perpetrator of an offense can be proven by direct or circumstantial evidence. *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim.App.1986). Direct evidence of the elements of the offense is not required. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex.Crim. App.2007). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Id.* at 14–15. Circumstantial evidence alone can be sufficient to establish guilt. *Id.* at 15.

Appellant argues the evidence is legally insufficient to prove she was the person

2. Appellant only challenges the legal sufficiency of the evidence on these two particular elements; accordingly, we will only address whether legally sufficient evidence supports these two particular elements. Under appellant's factual sufficiency argument discussed

below, her only challenge is that the evidence is factually insufficient to support a finding of intentional or knowing. Therefore, we will only address whether that particular element is supported by factually sufficient evidence.

who caused D.D.'s injuries because appellant was only one of several other people who had the opportunity to injure her. Appellant argues in her brief the jury was not entitled to find the elements of the offense simply by rejecting appellant's testimony she did not hurt the baby. Appellant argues the evidence failed to show the injuries occurred while appellant was alone with D.D., and since Dr. Allen testified he did not know exactly when the injuries occurred, the jury was left to speculate. Appellant also argues the evidence is legally insufficient to prove the manner and means of death. The jury was charged with four different possible theories of death which included: striking the complainant against an unknown object, striking the complainant with an unknown object, striking the complainant with the defendant's hand, or shaking the complainant with the defendant's hand. Appellant argues none of these theories were proven.

While Dr. Allen did testify he could not pinpoint exactly when D.D. sustained her injuries, he also testified in the vast majority of cases similar to this one, the child would be highly symptomatic within four to six hours after the injury, with the vast majority of symptoms occurring in the first hour. Dr. Allen further testified symptoms such as being severely lethargic or comatose, not responding appropriately, seizing, and perhaps vomiting are all symptoms which would occur almost immediately from the time of injury. Additionally, Dr. Gonsulan testified the injuries D.D. suffered would have caused instant loss of consciousness and the child would have been immediately unresponsive. While the medical doctors were unable to determine an exact time of death, the evidence did narrow down the potential time frame for death. Additionally, appellant herself testified that D.D. looked fine and responded normally up until 1:15 or 2:30

Monday morning and that if Green hurt the baby, he did so sometime between 6 p.m. and 9 p.m. Sunday evening. This evidence supports the jury's decision that appellant caused the injuries. Despite the circumstantial nature of the evidence, the jury was permitted to make reasonable inferences from the evidence presented at trial. *Id.* at 14–15. Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor. *Id.*

The jury's verdict that appellant caused the fatal injuries to the child in this case is also supported by additional evidence in the record including the following: appellant's failure to call 9-1-1 and her delay in getting D.D. to the emergency room, appellant's reaction when Davis tried to call 9-1-1, several witnesses' testimony regarding appellant's demeanor and behavior in the ambulance and at the emergency room, appellant's inconsistent statements given to the social worker and the police, Davis's testimony that D.D.'s crying got on appellant's nerves, appellant's past statements to Davis threatening to drown D.D. in the bathtub if he did not pick her up, testimony regarding a past spiral fracture to D.D.'s femur, medical testimony that D.D. suffered from malnutrition, and testimony appellant was a violent and untruthful person. Green was the only other person left alone with D.D. during the time frame in which the injuries could have occurred, and Green testified he never got angry with D.D. and he never hurt her. The jury, as the sole judge of the credibility of the witnesses, was free to believe all or part of Green's testimony and determine Green was not the perpetrator. *See Jones*, 984 S.W.2d at 257. Furthermore, the jury was free to disbelieve all or part of appellant's testimony. *See id.*

Additionally, evidence existed to prove the manner and means of death. The evidence at trial revealed D.D.'s cause of

death was craniocerebral trauma, which is more commonly referred to as blunt force trauma. Both Dr. Allen and Dr. Gonsulan testified the injuries sustained by D.D. were consistent with shaken baby syndrome and also with severe blunt force trauma to D.D.'s head either by hitting the child with something or hitting the child against something. Also, both doctors testified the injuries sustained were consistent with child abuse.

We have reviewed the entire record in this case. When viewed in the light most favorable to the verdict, we find the evidence is sufficient to permit a rational jury to find the elements of the offense beyond a reasonable doubt. *See Salinas,* 163 S.W.3d at 737. Accordingly, appellant's first issue is overruled.

## C. Was the Evidence Factually Sufficient?

█ In appellant's second issue, she argues the evidence was factually insufficient to prove appellant intentionally or knowingly committed the offense.

### 1. *Standard of Review*

█ In a factual sufficiency review, we consider all the evidence in a neutral light. *Prible v. State,* 175 S.W.3d 724, 730–31 (Tex.Crim.App.2005). The evidence may be factually insufficient in two ways. *Id.* at 731. First, when considered by itself, evidence supporting the verdict may be so weak the verdict is clearly wrong and manifestly unjust. *Id.* Second, where the evidence both supports and contradicts the verdict, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met. *Id.* In conducting a factual sufficiency review, we must employ appropriate deference so that we do not substitute our judgment for that of the fact finder. *Jones v. State,* 944 S.W.2d 642, 648 (Tex.Crim.App.1996). Our analysis

must consider the evidence appellant claims is most important in allegedly undermining the jury's verdict. *Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

### 2. *Analysis*

█ For the State to prove appellant committed capital murder, it was required to prove she intentionally or knowingly caused D.D.'s death. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). Proof of a culpable mental state almost invariably depends upon circumstantial evidence. *Montgomery,* 198 S.W.3d at 87; *Morales v. State,* 828 S.W.2d 261, 263 (Tex. App.-Amarillo 1992), *aff'd,* 853 S.W.2d 583 (Tex.Crim.App.1993). Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Patrick v. State,* 906 S.W.2d 481, 487 (Tex.Crim.App.1995). In a murder case, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can be controlling upon the issue of intent or knowledge. *Id.* Additionally, culpable mental state can be inferred from the acts, words, and conduct of the accused. *Id.*

The extent of D.D.'s injuries contributes to a showing of intent. In this case, Dr. Allen testified the type of head injuries sustained by D.D. were inconsistent with a minor head injury, but instead, were injuries similar to those that would result from crashing in a high speed motor vehicle accident, falling from a roof, or being hit with a baseball bat. Dr. Allen also testified the injuries D.D. sustained to her body were highly consistent with child abuse and were typically caused by high amounts of force. Dr. Allen testified D.D.'s injuries were "all high speed, high velocity injuries, which were directly intended to hurt [D.D.]." Dr. Gonsulan testi-

fied similar to Dr. Allen. According to Dr. Gonsulan, the head injuries suffered were caused by blunt force trauma, and the spiral fracture on D.D.'s femur was consistent with child abuse. *See Montgomery,* 198 S.W.3d at 87 (using the severity of the injuries sustained by the infant as evidence of appellant's intent).

The difference in size between appellant and D.D. also contributes to a showing of intent. While the record does not establish appellant's size, it is reasonable to assume she was much larger than her ten-month-old baby who weighed approximately seventeen pounds. *See Sadler v. State,* 364 S.W.2d 234, 237 (Tex.Crim.App.1963) (finding evidence of intent where male defendant, a boxer, who was thirty years old, over six feet tall, and weighed 190 pounds, killed the female complainant who was twenty-two years old, five feet tall, and weighed ninety to one hundred pounds, by hitting her in the face and head with his hands and fists).

Furthermore, appellant's acts before and after the baby went to the hospital contribute to a showing of intent. This testimony includes: witnesses' testimony that appellant threatened to drown D.D., appellant's failure to call 9-1-1, her delay in getting D.D. to the hospital, testimony appellant was laughing and chatting with the ambulance driver on the way to the hospital, testimony appellant was laughing and talking on her phone in the emergency room, testimony from the medical doctor that appellant appeared disinterested in her child, and appellant's inconsistent statements to the social worker and the police.

Appellant argues the testimony from Caballero and Larson is the most important evidence that undermines the jury's verdict. Caballero, the paramedic who arrived at the scene, and Larson, a fire department captain on the scene, both testified the child showed no outward signs of trauma when they first observed her at appellant's house. Caballero testified he did not notice anything unusual and D.D. was responding to stimuli. Appellant argues this evidence is so contrary to the medical doctors' testimony regarding the severity of D.D.'s injuries the jury's verdict is against the great weight and preponderance of the evidence. We disagree. Both Caballero's and Larson's assessment of the child was a brief observance of the outward physical trauma D.D. suffered. The medical doctors' testimony primarily addressed the internal injuries suffered by D.D. and the severity of those injuries which ultimately killed her. Caballero's and Larson's testimony is not in stark contrast to the doctors' testimony and does not undermine the jury's verdict. Furthermore, reconciliation of any conflicts in the evidence falls within the exclusive province of the jury. *Heiselbetz v. State,* 906 S.W.2d 500, 504 (Tex.Crim.App.1995).

After considering all the evidence in a neutral light, we find the contrary evidence is not so strong that the beyond-a-reasonable-doubt standard could not have been met, nor is the evidence supporting the verdict so weak it is clearly wrong and manifestly unjust. *See Prible,* 175 S.W.3d at 730–31. Accordingly, appellant's second issue is overruled.

**D. Did the Trial Court Err in Refusing to Include the Lesser Included Offense of Injury to a Child in the Jury Charge?**

In her third point of error, appellant argues the trial court erred in denying her request to include the lesser included offense of injury to a child in the jury charge.[3]

### 1. Standard of Review

 In order for a trial court to determine whether it should charge a jury on a lesser offense than the one for which the defendant is indicted, the trial court employs a two-prong test: (1) the lesser included offense must be included within the proof necessary to establish the offense charged; and (2) some evidence must exist that would allow a jury to rationally find that if the defendant is guilty, he is guilty only of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App.1993); *Paz v. State*, 44 S.W.3d 98, 100 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd, untimely filed). In making this determination, we must review all the evidence admitted at trial. *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim.App.2000); *Paz*, 44 S.W.3d at 100. If more than a scintilla of evidence from any source raises the issue that the defendant is guilty only of the lesser included offense, the instruction must be submitted. *Forest v. State*, 989 S.W.2d 365, 367 (Tex. Crim.App.1999); *Paz*, 44 S.W.3d at 100. Credibility of the evidence and whether it conflicts with other evidence is not to be considered when determining whether the jury should have been charged with a lesser included offense. *Banda v. State*, 890 S.W.2d 42, 60 (Tex.Crim.App.1994); *Paz*, 44 S.W.3d at 100.

### 2. Analysis

Appellant was charged with capital murder for intentionally or knowingly causing the death of an individual under six years of age. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(8). A person commits the offense of injury to a child if he intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, causes serious bodily injury to a child. *Id.* § 22.04(a)(1). Serious bodily injury is defined in the penal code as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(46). A person acts recklessly when "he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or will occur." *Id.* § 6.03(c). A person acts with criminal negligence when he "ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(d).

 The first prong of the test is satisfied. Injury to a child is a lesser included offense of capital murder. *Paz*, 44 S.W.3d at 101; *See* Tex.Code Crim. Proc. Ann. art. 37.09 (Vernon 2003) (providing the general rules for when an offense qualifies as a lesser included offense). However, we

**3.** During trial, appellant also requested a charge on injury to a child by omission. On appeal, however, appellant only argues that injury to a child should have been submitted to the jury, so she has waived her injury to a child by omission argument. *See* Tex.R.App. P. 38.1; *McIntyre v. Wilson*, 50 S.W.3d 674, 682 (Tex.App.-Dallas 2001, pet. denied). Also, the State argues appellant only preserved her request for injury to a child by omission during trial because appellant's primary arguments during her objection focused on why the evidence supported injury to a

child by omission. We disagree with the State. To preserve an argument regarding the trial court's failure to include a lesser included offense in the charge, the appellant must make a request or objection before the charge goes to the jury and be specific enough to put the trial court on notice of the omission or error in the charge. *See* Tex.Code.Crim. Proc. Ann. art. 36.15 (Vernon 2003). Before the charge went to the jury, appellant requested the trial court include both injury to a child and injury to a child by omission; therefore, she sufficiently preserved error.

must also determine whether some evidence existed that would allow a jury to rationally find that if appellant was guilty, she was guilty only of the lesser offense. See Paz, 44 S.W.3d at 101.

In support of the second prong of the test, appellant argues the evidence of her intent was primarily derived from the testimony of Dr. Allen and Dr. Gonsulan regarding the nature of the injuries and that the testimony of Caballero and Larson contradicted the doctors' opinions. As discussed above, Caballero and Larson both testified they saw no outward signs of trauma and no indication of significant injuries when they observed D.D. at appellant's apartment. Appellant argues this testimony is in stark contrast to the doctors' testimony regarding the severity of D.D.'s injuries. Appellant argues a rational jury could conclude from this evidence the medical doctors' testimony was greatly exaggerated and, instead, Caballero's and Larson's testimony is proof appellant did not intend to kill D.D. or know death would result. Additionally, appellant argues her failure to call 9–1–1 and delay in taking D.D. to the hospital helped prove appellant did not understand the severity of the injuries, which supports the inference that her actions were not intentional or knowing but, instead, were only reckless or criminally negligent.

We do not agree with appellant that Caballero's and Larson's testimony contradicts the testimony of the medical doctors. The testimony of Caballero and Larson dealt with whether they observed outward physical signs of trauma on D.D.'s body. Neither Caballero nor Larson were trained medical doctors who could testify to the true severity of the injuries D.D. suffered internally. In fact, Larson testified while he did not observe outward signs of trauma, closed head injuries were often hard to see. Also, Caballero admit-

ted this was his first baby case and he did not feel very confident in his assessment. Simply because Caballero and Larson were unable to assess the true severity of the injuries does not support a finding that the medical doctors' testimony was greatly exaggerated and that appellant acted recklessly or with criminal negligence. This testimony is not evidence that appellant was aware of but consciously disregarded a substantial and unjustifiable risk, which is required for a reckless mens rea, nor is it evidence that appellant ought to have been aware of a substantial and unjustifiable risk, which is required for a criminally negligent mens rea. See Tex. Penal Code Ann. § 6.03(c),(d).

Because there were no witnesses to the offense, we must rely on the testimony of expert witnesses to inform us of the nature of D.D.'s injuries. See Paz, 44 S.W.3d at 102. Dr. Allen testified D.D. was a severely beaten child and her injuries were "all high speed, high velocity injuries, which were directly intended to hurt [the] child." He testified D.D.'s head injury was highly inconsistent with a minor head injury and more similar to injuries caused by crashing in a high speed motor vehicle accident or being hit with a baseball bat. Additionally, the retinal hemorrhages, the multiple broken bones, and the types of fractures suffered were all indications the injuries were intentionally inflicted. Dr. Allen also testified whoever killed D.D. would have immediately known she was severely injured, and a majority of the symptoms would have occurred almost immediately from the time of injury. Dr. Gonsulan testified the spiral fracture D.D. suffered was a common injury in child abuse cases, and that D.D. died from blunt force trauma to the head. She also testified D.D.'s injuries would have caused instant loss of consciousness and would have been immediately unresponsive. We believe this evidence supports a finding of intent, and the

testimony appellant relies on to argue she was entitled to a lesser included offense charge of injury to a child was no evidence at all.

Additionally, throughout the entire trial, appellant's defense was that she never committed any acts of violence against her baby. Appellant denied hurting her baby in her statements to the paramedics, the doctors, the social worker, the police officers, and in her testimony at trial. In fact, appellant blamed D.D.'s injuries on the daycare, the hospital, and her boyfriend. In *Bignall v. State*, the Court of Criminal Appeals concluded " 'if a defendant either presents evidence that he committed no offense or presents no evidence, and there is no evidence otherwise showing that he is guilty only of a lesser-included offense, then a charge on a lesser-included offense is not required.' " *Bignall v. State*, 887 S.W.2d 21, 24 (Tex.Crim.App.1994) (quoting *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex.Crim.App.1985)). Because we find appellant's argument above was no evidence and because appellant's defense at trial was that she did not commit the acts against her baby, a charge on a lesser-included offense is not required. *See id.* Accordingly, we find the trial court did not err in refusing to charge the jury on the lesser included offense of injury to a child. Appellant's third issue is overruled.

### CONCLUSION

Having determined the judgment for punishment incorrectly states that a jury assessed punishment, we modify the judgment to properly reflect that the judge assessed appellant's punishment. Having overruled each of appellant's issues, we affirm the judgment of the trial court as modified.