Opinion filed June 2, 2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00194-CR

                                                    __________

 

                        TORREY
RODRIGUEZ TORRES, Appellant

                                                             V.

                                      STATE
OF TEXAS, Appellee



 

                                   On
Appeal from the 104th District Court

                                                            Taylor
County, Texas

                                                    Trial
Court Cause No. 16638B

 



 

                                                                  O
P I N I O N

            Upon
his plea of not guilty, a jury convicted Torrey Rodriguez Torres of the offense
of murder and assessed his punishment at confinement for life; the trial court
sentenced him accordingly.  We affirm.

            In
his first issue, Torres complains that the trial court erred when it refused to
give his requested jury charge on the lesser included offense of criminally
negligent homicide.  In his second and third issues, Torres argues that the
evidence is legally and factually insufficient to sustain the murder
conviction.  

            We
will first discuss the sufficiency issues.  We note
at the outset of our analysis that the Texas Court of Criminal Appeals has now
held in Brooks v. State, 323 S.W.3d 893 (Tex. Crim. App. 2010), that there is “no meaningful distinction between the Jackson v. Virginia[1] legal-sufficiency
standard and the Clewis[2] factual-sufficiency standard”; that the Jackson v.
Virginia standard is the “only standard that a reviewing court should apply
in determining whether the evidence is sufficient to support each element of a
criminal offense that the State is required to prove beyond a reasonable
doubt”; and that “[a]ll other cases to the contrary, including Clewis,
are overruled.”  Brooks, 323 S.W.3d at 895, 902, 912 (footnotes added). 
Accordingly, a challenge to the factual sufficiency of the evidence is no
longer viable.  We also note that neither Torres nor the State had the benefit
of the opinion in Brooks when this case was briefed.  

            We will review Torres’s sufficiency challenges
under the legal sufficiency standard set forth in Jackson v. Virginia. 
Under this standard, we must review all of the evidence in the light most
favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307; Brooks, 323 S.W.3d at 899.  Direct evidence of the
requisite intent or knowledge is not required.  A jury may infer intent or
knowledge from any facts that tend to prove the existence of intent or
knowledge.  Those facts might include the acts, words, and conduct of the
accused, as well as the method used to commit the crime and the nature of
wounds inflicted on the victim.  Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002).  Proof of a culpable mental state almost always depends upon
circumstantial evidence.  Martin v. State, 246 S.W.3d 246, 263 (Tex.
App.—Houston [14th Dist.] 2007, no pet.).  Juries are permitted to make
reasonable inferences from the evidence presented at trial, and circumstantial
evidence is as probative as direct evidence in establishing guilt.  Hooper
v. State, 214 S.W.3d 9, 14-16 (Tex. Crim. App. 2007).  Circumstantial
evidence alone can be sufficient to establish guilt.  Id. at 15.  In our
review, we will give deference to the duty of the factfinder to resolve
credibility issues and to weigh the evidence, including any reasonable
inferences from that evidence.  Id. at 13.

            A
person commits the offense of murder if the person intentionally or knowingly
causes the death of an individual.  Tex.
Penal Code Ann. § 19.02(b)(1) (Vernon
2011).  Torres specifically calls into question the sufficiency of the evidence
to show knowledge and intent.

            The
Texas Penal Code provides that “[a] person acts intentionally, or with intent,
with respect to the nature of his conduct or to a result of his conduct when it
is his conscious objective or desire to engage in the conduct or cause the
result.”  Section 6.03(a).

            The
Texas Penal Code also provides that a person acts knowingly, or with knowledge,
with respect to the nature of his conduct or to circumstances surrounding his
conduct when he is aware of the nature of his conduct or that the circumstances
exist.  A person acts knowingly, or with knowledge, with respect to a result of
his conduct when he is aware that his conduct is reasonably certain to cause
the result.  Section 6.03(b).  Murder, intentionally or knowingly committed, is
a result-oriented offense.  Roberts v. State, 273 S.W.3d 322, 328-29
(Tex. Crim. App. 2008).

            The victim
in this case was Luz Marie Gomez; she had various nicknames, but we will refer
to her as the victim in order to avoid confusion with other people in this
case.

            Torres
testified that, on the day before the shooting, he left work at 6:30 or 7:00 in
the evening.  He went home, took a shower, and then went to “Big Maria’s”
house.  Big Maria is the nickname given to one of the victim’s sisters.  The
victim, who was one of Torres’s girlfriends,  stayed most of the time with Big
Maria and Big Maria’s longtime boyfriend, Ezequil Alvarez, along with their
four children.

            Sylvia
Carrillo was another of the victim’s sisters.  According to Sylvia’s testimony,
on the day before the shooting, the victim told her that she might be pregnant
and was afraid of how Torres would react to that news.  Additionally, Big Maria
testified that the victim had told her that she wanted to break up with Torres
but was afraid to do that.  However, Big Maria said that the victim had told
Torres to get his things from the house.  Alvarez testified that Torres had
said that he would kill the victim if she tried to break up with him.

            There
is testimony in the record that one of the reasons the victim wanted to break
up with Torres was his involvement with other females.  One of those females
was Merlinda Blanca Deleon; she and Torres previously had a child together. 
Although Torres and Merlinda had not seen each other in a month, they regularly
talked on the phone and had planned to see each other later on in the night
that the victim was shot.

            The
testimony shows that Torres went to the victim’s house around 7:30 on the night
before the shooting.  While Big Maria fed her children, Torres and the victim
sat outside on the porch.

            Sylvia
lived in a house behind the house in which the victim lived and in which she
was shot; there was a common backyard between the two houses.  Her testimony is
that, around 10:00 p.m., Torres and the victim left Big Maria’s house and came
to her house.  Sylvia had seven children, and there were also other young
people visiting there on the night before the shooting.

            One
of the children visiting at Sylvia’s house that night was Jessica Urrabazo. 
She was eleven years old at the time the victim was shot and thirteen years old
at the time of trial.  She testified that she was spending the night at
Sylvia’s on the night before the victim was shot.   When Torres came to
Sylvia’s house, he had a gun with him.  The gun was silver and black and looked
“like an officer’s gun.”  He was showing the gun off and tried to get the
children to touch it.  One of them did touch the gun.  He also took the clip
out of the gun and showed the bullets to the children.  He continued to do that
even after the victim told him to put the gun away.

            Later
in the evening, Torres and the victim went back to Big Maria’s house.  Torres
testified that he carried the pistol in his “waistline” when he went back and
forth from Sylvia’s house to the victim’s house.

            Big
Maria testified that she went to sleep about 12:30 a.m.  When she went to bed,
Torres and the victim were in the living room.  Later, Big Maria got up to be
sure that “everything was locked.”  Torres was sitting on a couch in the living
room, and the victim was lying down on it.  Torres had a chrome and silver
handgun in his hand, took a bullet out of it, cleaned the bullet with his
shirt, put the bullet back in the clip, and put the gun in a drawer by the
couch.

            The
next time that she saw Torres and the victim, Torres was lying on the couch and
the victim was asleep on the floor next to the couch.  Later, shortly before
4:00 a.m., Big Maria and Alvarez got out of bed and walked out of the bedroom. 
When Big Maria opened the refrigerator, she noticed a “curtain flying in the
living room.”  Big Maria asked Alvarez to see what was happening.  He turned on
the light, and she noticed that the front door was open and that the victim was
lying on the floor by the couch where Big Maria had seen her sleeping earlier. 
Alvarez looked for Torres, but Torres was gone.  He saw that the victim was
lying on the floor “on her side and her stomach face down” in a pool of blood. 
He realized that she was dead.

            Big
Maria went to Sylvia’s house, and Sylvia called 9-1-1 around 4:00 a.m. 
Sergeant James Young with the Abilene Police Department and other officers
responded.  When Sergeant Young arrived at the scene, he saw the victim
lying on the floor with a large amount of blood around her head and on the
floor.  It was Sergeant Young’s opinion that the victim was dead.  EMTs also
came to the scene.  They detected no vital sign activity, and they left.

            At
the time of the shooting, Detective John Reid was the Sergeant Supervisor in
the Crimes Against Persons Unit in the Abilene Police Department.  He and other
law enforcement personnel gathered evidence at the scene.  That evidence
included clothing and a shell casing.   Detective Reid testified about the
blood flow patterns, as well as the absence of blood flow patterns, that he
observed on and around the victim’s body and clothing.  He did not notice any
bloodstains on the victim’s pants, legs, or feet that would show a “downward
directionality” of the victim’s blood.  The blood flow was horizontal, not
vertical as it would have been had the victim been in an upright position.  It
was his expert opinion that the victim was not in a sitting or standing
position when she was shot; she was lying down.

            Detective
James David Atkins, a twenty-two year veteran of the Abilene Police Department,
and Detective Will Ford, a twenty-four year veteran of the Abilene Police
Department, went to talk to Torres at around 6:45 a.m.  He was at his parents’
house some three blocks away from the house in which the victim was shot. 
Detective Ford was the lead investigator and conducted an interview with Torres
at the Law Enforcement Center.

            After
Detective Ford interviewed Torres, Detective Tatum and Detective Atkins went to
Torres’s parents’ house and, with Torres’s parents’ consent, searched the
property.  Other law enforcement officers joined in the search.  During the
search, the officers found the clothing that Torres had worn at the time of the
shooting; some of the clothing was found on the washing machine or dryer, and
some behind it.  Also, certain items of clothing had blood on them.

            When
the officers searched outside the residence, they found the pistol used in the
shooting; it was under a shed in the backyard.  The clip was found stuffed
under a cushion on a couch or loveseat in the backyard.  There was a live round
in the chamber of the pistol and six rounds in the clip.

            After
the interview with Torres and after the authorities found the evidence mentioned,
they arrested him.

            Carolyn
Van Winkle, the crime lab quality manager and senior DNA analyst in the Tarrant
County Medical Examiner’s office, testified that she received Torres’s shirt,
denim shorts, white ankle socks, and a left Jordan athletic shoe from Detective
Will Ford.  She also received these four “swabbings” from a gun:  the barrel
end of the slide, the trigger, the grips, and the slide groups.  Additionally,
she received the victim’s DNA as well as a DNA sample obtained from Torres.

            Van
Winkle performed DNA tests upon the items.  She found the victim’s DNA on the denim
shorts, the shoe tongue, and one of the socks.  She testified that the
probability of selecting an unrelated individual at random that would have the
same profile as in the samples, and that would be Southwest Hispanic, would be
approximately 1 in 1.2 quadrillion.

            The
swab from the barrel end of the slide tested positive, presumptively, for
blood.  The swabs obtained from the trigger, grips, and slide did not test
positive for blood, but Van Winkle generated DNA profiles from them.  She found
the victim’s DNA, Torres’s DNA, and some “alleles” that could be attributed to
neither the victim nor Torres on the trigger swab and the grips swab.  The
major DNA profile on the slide swab was the victim’s.  The probability of
selecting an unrelated person, at random, who would have the same DNA profile
as the victim, as shown from the slide swab, would be approximately 1 in 292
billion among Southwest Hispanics.

            Clayton
Daniels, Abilene Police Department criminalist officer, examined the pistol and
the clip and found no readable, useable fingerprints on either.

            Richard
Ernest was the leader of the firearms section of the Tarrant County Medical
Examiner’s Crime Laboratory at the time of this shooting.  He examined various
items that he received from the Abilene Police Department, including a Walther
P99, 9 mm, the handgun believed to have been used when the victim was shot. 
Ernest performed various tests, including tests on bullets that he fired from
that handgun, and made comparisons with the shell casing found at the scene and
with the bullet found in the victim’s brain at autopsy.  Ernest’s expert
opinion was that the shell casing was fired from the chamber of the Walther and
that the bullet obtained at autopsy was fired from it also.  Both of those
results were to the exclusion of all others.

            Dr.
Marc Krouse had been with the Tarrant County Medical Examiner’s Office since 1978;
he was the Chief Deputy Medical Examiner.  Dr. Krouse performed an autopsy on
the victim’s body.  The only injury he found was a gunshot wound in the face;
the bullet was still in the victim’s head.  The bullet hit her in the left eye
at the place where the upper and lower eyelids join.  The bullet tracked very
slightly from left to right, almost straight.  The track top to bottom was
“pretty flat.”  Dr. Krouse noted a dense area of gunpowder stippling and
tattooing around the bullet wound.  He explained that, when a handgun is fired,
some of the powder that comes out is either burning or unburned and is
traveling as fast as the bullet, if not faster.  If the powder hits the skin
and falls off, then it is classified as “stippling.”  If the powder embeds in
the skin, it is called “tattooing.”  In the autopsy, Dr. Krouse found
well-defined areas of stippling as well as tattooing.  The area in which
stippling occurred was about a four-by-five inch area.  He found tattooing in a
two and one-half inch area around the wound.  The implication is that the shot
in this case was fired at close range.  Ernest told the jury that, based upon
this type of stippling and tattooing, it was his opinion that the shot was
fired at a distance of less than one foot – “somewhere in the range of about
six to eight inches, nine inches.”

            Torres
testified at trial.  He went to Big Maria’s house after he got off work.  He
and the victim talked neither about her being pregnant nor about their breaking
up; they did not argue.   Around 9:30 in the evening, Torres and the victim
went to Sylvia’s house.  Torres played an Xbox game with someone there.  He had
the handgun with him when he went to Sylvia’s; he was carrying it in his
“waistline.”  He did not bring the gun to Big Maria’s; he got it from Alvarez
after he got there.  Contrary to Urrabazo’s testimony, Torres denied ever
showing the pistol to any of the children who were at Sylvia’s.

            Torres
testified that, about 10:00 or 10:30 in the evening, Sylvia told the children
that they were being too loud.  Torres and the victim went back to Big Maria’s
house.  Alvarez and Big Maria were in their room.  Torres and the victim had
sex in the living room at around 11:00 or 11:30.  Afterwards, he was lying on
the couch and talking to the victim who was sitting on the couch.  He had
placed the gun in the drawer by the couch.  It was the same drawer where Torres
said he had originally found the gun.  There was also a Glock 40 in the drawer,
and at some point in time, Alvarez came into the living room, got the Glock,
and took it to the bedroom with him.  Alvarez testified that he had no guns in
the house but that he had seen Torres with the pistol.

            While
he was lying on the couch and the victim was sitting on the couch, Torres heard
the gun load.  When he heard the gun load, he got up and saw the victim with
the gun in her hand.  He took the gun away from her, took the clip out, cocked
the gun to eject the bullet, put the ejected bullet back in the clip, put the
clip back in the pistol, and put the pistol back in the drawer.  He lay back
down on the couch.  Later, Torres heard the victim get up to get a drink and
then she sat back down at the end of the couch.  Torres turned around and saw
that the victim had the gun again.  She was still sitting on the couch, and
Torres was sitting on the couch on the victim’s right side.  This time, the
victim was playing with the pistol.  She was taking the clip out.  Torres did
not hear her get the gun this time, “something told me to turn around.”  He
grabbed the pistol by the grip with the barrel pointed toward the victim, and
he took the gun away from her again.  But, he said, this time she tried to get
the pistol back, and it went off and hit her in the head.

            Torres
also testified that he panicked and ran to his parents’ house.  He hid the
pistol and the clip in the places where the police found them.

            Alice
Pena Rodriguez is Torres’s mother.  She lived about three or four blocks from
where the victim lived.  Torres came to her house around 1:30 a.m.  He told
Alice that the victim was “tripping” and that he left.  Although she did not
know what that meant, she assumed that the victim was “yelling at him or
something.”  Torres wanted his mother to take him to pick up Merlinda.

            Merlinda’s
mother, Juanita Deleon, testified that Merlinda woke her up about 1:40 a.m. and
said that Torres had phoned.  He had told Merlinda that the victim had shot
herself.

            Merlinda
testified that, although Torres was acting normally when he picked her up, he
was acting in a way she had never seen him act after they went to his parents’
house.  He appeared to be scared and nervous.  Torres was sweating and did not
want anyone to turn on the lights or watch television.  He kept asking about
traffic and who was driving by.

            Merlinda
heard an ambulance about 4:00 a.m.  Torres had gone to sleep by that time, but he
woke up when the police came for him about 7:00 a.m.

            When
the police interviewed Torres, he at first told them that he was already on the
way to his parents’ house when he heard a gunshot.  Torres admitted at trial
that he had lied about that and that what had really happened was that he had
tried to take the gun away from the victim, she tried to get it back, it
discharged and killed her.  Torres had known the victim all of her life.  He
was seventeen years old; she was sixteen.

            The
only contest in the evidence is whether Torres shot the victim or whether the
pistol went off while Torres and the victim struggled over it.  The jury was
free to infer Torres’s intent or knowledge from any facts that tend to prove
the existence of intent or knowledge.  The jury could consider Torres’s acts,
words, and conduct in making its decision.  It could also consider the method
used to commit the crime as well as the nature of wounds inflicted on the
victim.  Hart, 89 S.W.3d at 64.  The expert testimony is that the victim
was not sitting up but, rather, lying down when she was shot in the left eye. 
The trajectory of the bullet as well as the testimony about stippling and
tattooing support that conclusion. The jury was the judge of the weight and
credibility of the evidence.  It was free to accept or reject Torres’s
position.  It is apparent that the jury rejected it.

            Under
the standard of review that we have previously set forth and based upon the
evidence that we have discussed, we hold that a
rational trier of fact could have found the essential elements of the crime of
murder beyond a reasonable doubt.  The evidence is sufficient to support
the verdict of the jury that Torres committed the offense of murder by
intentionally or knowingly causing the death of the victim by shooting her with
a handgun.  Torres’s second and third issues are overruled.

            In
his first issue, Torres asserts that the trial court erred when it denied his
requested jury charge on the lesser included offense of criminally negligent
homicide. 

            There
is a two-pronged test to be used to determine when a lesser included offense
must be included in the jury charge when requested by a defendant.  First, the
lesser included offense must be included within the proof necessary to
establish the offense charged.  Second, some evidence must exist in the record
that would permit a rational jury to find that, if the defendant is guilty, he
is guilty only of the lesser offense.  Rousseau v. State, 855 S.W.2d
666, 673 (Tex. Crim. App. 1993); Royster v. State, 622 S.W.2d 442, 446
(Tex. Crim. App. 1981).

            If
evidence from any source raises the issue that a lesser included offense may
have been committed and the issue is properly requested, the charge must be given. 
Moore v. State, 574 S.W.2d 122, 124 (Tex. Crim. App. 1978).  A defendant
is entitled to an instruction on every issue raised by the evidence, whether
produced by the State or the defendant, regardless if it is strong, weak,
unimpeached, or contradicted.  Thompson v. State, 521 S.W.2d 621, 624,
(Tex. Crim. App. 1974).

            The
first prong of the Royster-Rousseau test is met in this case. 
Criminally negligent homicide is a lesser included offense of the offense of
murder.  Thomas v. State, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985).

            “A
person commits an offense if he causes the death of an individual by criminal
negligence.”  Section 19.05(a).

            Criminal
negligence is defined as follows in Section
6.03(d):

A
person acts with criminal negligence, or is criminally negligent, with respect
to circumstances surrounding his conduct or the result of his conduct when he
ought to be aware of a substantial and unjustifiable risk that the
circumstances exist or the result will occur.  The risk must be of such a nature
and degree that the failure to perceive it constitutes a gross deviation from
the standard of care that an ordinary person would exercise under all the
circumstances as viewed from the actor’s standpoint.  

 

The difference
between murder and criminally negligent homicide lies in the different culpable
mental states required in each offense.  The culpable mental state for murder
under Section 19.02(b)(1) is that, to be guilty of that offense, one must
knowingly and intentionally cause the death of an individual.  Section 19.02(b)(1).  The court in Thomas,
in order to better understand and explain whether the evidence raised
criminally negligent homicide, compared the culpable mental states required for
involuntary manslaughter and for criminally negligent homicide.  Thomas,
699 S.W.2d at 849.  The court discussed the fact that recklessness is the
culpable mental state required for involuntary manslaughter, while criminal
negligence is the culpable mental state required for criminally negligent
homicide.  Id.  The court noted that there is a difference in risk
awareness when reckless conduct is compared to criminally negligent conduct.  Id. 
The court quoted from Lewis v. State, 529 S.W.2d 550, 553 (Tex. Crim.
App. 1975), and said that reckless conduct involved:

[C]onscious risk
creation, that is, the actor is aware of the risk surrounding his conduct or
the results thereof, but consciously disregards that risk.  Criminal negligence
. . . involves inattentive risk creation, that is, the actor ought to be aware
of the risk surrounding his conduct or the results thereof.  At the heart of
reckless conduct is conscious disregard of the risk created by the actor’s
conduct; the key to criminal negligence is found in the failure of the actor to
perceive the risk.

 

            The
only evidence in this case that Torres claims raises the issue of criminally
negligent homicide is his own testimony.  His claim is that the shooting was an
accident.  First of all, accidental discharge alone does not raise the issue of
criminally negligent homicide.  Thomas, 699 S.W.2d at 850.  In our
review, we are required to examine the facts and circumstances of this case to
determine whether Torres was unaware of the risk that his conduct created.  Id. 


             
The evidence showed that Torres had been carrying the pistol around in his
waistband.  The evidence also showed that he had taken the clip out of the
pistol numerous times.  He had also removed bullets from it and put them back
into the clip.  Prior to the time that the victim was shot, Torres testified
that he had taken the gun away from the victim, cocked the gun back to eject a
live round from the chamber, put the round into the clip, put the clip back in
the gun, and  put the gun back into the drawer next to the couch.  These
actions show that Torres was familiar with pistols, at least with this one.  As
an indication of his awareness that pistols were dangerous, when Torres first
took the pistol away from the victim, he took the bullet out of the chamber. 
By taking the pistol away from her the second time, he exhibited that same
awareness.  As far as whether he knew that a bullet was or was not in the
chamber, he knew that, according to his testimony, she had put a bullet in the
chamber earlier and he had taken care to eject it.   We believe that all of
this testimony showed that Torres was not one who simply failed to see the risk
involved.  There is nothing in this record that would allow a rational jury to
find that, if the defendant is guilty, he is guilty only of the lesser
offense of criminally negligent homicide and not guilty of the greater offense
of murder.  The trial court did not err when it refused to submit a charge on
criminally negligent homicide.  Torres’s first issue is overruled.

            We
affirm the judgment of the trial court.

 

                                                                                    

                                                                                                JIM
R. WRIGHT

                                                                                                CHIEF
JUSTICE

 

June 2, 2011

Publish.  See
Tex. R. App. P. 47.2(b).

Panel[3]
consists of:  Wright, C.J.,

McCall, J., and Hill, J.[4]









[1]Jackson v. Virginia, 443 U.S. 307 (1979).

 





[2]Clewis v. State,
922 S.W.2d 126 (Tex. Crim. App. 1996). 





[3]Rick Strange, Justice, resigned effective April 17,
2011.  The justice position is vacant pending appointment of a successor by the
governor.

 





[4]John G. Hill, Former Justice, Court of Appeals, 2nd
District of Texas at Fort Worth, sitting by assignment.