**Opinion filed June 2, 2011**



In The

# Eleventh Court of Appeals

_____

## No. 11-09-00194-CR
_____

## TORREY RODRIGUEZ TORRES, Appellant
## V.
## STATE OF TEXAS, Appellee

**On Appeal from the 104th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 16638B**

## O P I N I O N

Upon his plea of not guilty, a jury convicted Torrey Rodriguez Torres of the offense of murder and assessed his punishment at confinement for life; the trial court sentenced him accordingly. We affirm.

In his first issue, Torres complains that the trial court erred when it refused to give his requested jury charge on the lesser included offense of criminally negligent homicide. In his second and third issues, Torres argues that the evidence is legally and factually insufficient to sustain the murder conviction.

We will first discuss the sufficiency issues. We note at the outset of our analysis that the Texas Court of Criminal Appeals has now held in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim.

App. 2010), that there is "no meaningful distinction between the *Jackson v. Virginia*[1] legal-sufficiency standard and the *Clewis*[2] factual-sufficiency standard"; that the *Jackson v. Virginia* standard is the "only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt"; and that "[a]ll other cases to the contrary, including *Clewis*, are overruled." *Brooks*, 323 S.W.3d at 895, 902, 912 (footnotes added). Accordingly, a challenge to the factual sufficiency of the evidence is no longer viable. We also note that neither Torres nor the State had the benefit of the opinion in *Brooks* when this case was briefed.

We will review Torres's sufficiency challenges under the legal sufficiency standard set forth in *Jackson v. Virginia*. Under this standard, we must review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307; *Brooks*, 323 S.W.3d at 899. Direct evidence of the requisite intent or knowledge is not required. A jury may infer intent or knowledge from any facts that tend to prove the existence of intent or knowledge. Those facts might include the acts, words, and conduct of the accused, as well as the method used to commit the crime and the nature of wounds inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Proof of a culpable mental state almost always depends upon circumstantial evidence. *Martin v. State*, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Juries are permitted to make reasonable inferences from the evidence presented at trial, and circumstantial evidence is as probative as direct evidence in establishing guilt. *Hooper v. State*, 214 S.W.3d 9, 14-16 (Tex. Crim. App. 2007). Circumstantial evidence alone can be sufficient to establish guilt. *Id*. at 15. In our review, we will give deference to the duty of the factfinder to resolve credibility issues and to weigh the evidence, including any reasonable inferences from that evidence. *Id.* at 13.

A person commits the offense of murder if the person intentionally or knowingly causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011). Torres specifically calls into question the sufficiency of the evidence to show knowledge and intent.

---

[1]*Jackson v. Virginia*, 443 U.S. 307 (1979).

[2]*Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996).

The Texas Penal Code provides that "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." Section 6.03(a).

The Texas Penal Code also provides that a person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. Section 6.03(b). Murder, intentionally or knowingly committed, is a result-oriented offense. *Roberts v. State*, 273 S.W.3d 322, 328-29 (Tex. Crim. App. 2008).

The victim in this case was Luz Marie Gomez; she had various nicknames, but we will refer to her as the victim in order to avoid confusion with other people in this case.

Torres testified that, on the day before the shooting, he left work at 6:30 or 7:00 in the evening. He went home, took a shower, and then went to "Big Maria's" house. Big Maria is the nickname given to one of the victim's sisters. The victim, who was one of Torres's girlfriends, stayed most of the time with Big Maria and Big Maria's longtime boyfriend, Ezequil Alvarez, along with their four children.

Sylvia Carrillo was another of the victim's sisters. According to Sylvia's testimony, on the day before the shooting, the victim told her that she might be pregnant and was afraid of how Torres would react to that news. Additionally, Big Maria testified that the victim had told her that she wanted to break up with Torres but was afraid to do that. However, Big Maria said that the victim had told Torres to get his things from the house. Alvarez testified that Torres had said that he would kill the victim if she tried to break up with him.

There is testimony in the record that one of the reasons the victim wanted to break up with Torres was his involvement with other females. One of those females was Merlinda Blanca Deleon; she and Torres previously had a child together. Although Torres and Merlinda had not seen each other in a month, they regularly talked on the phone and had planned to see each other later on in the night that the victim was shot.

The testimony shows that Torres went to the victim's house around 7:30 on the night before the shooting. While Big Maria fed her children, Torres and the victim sat outside on the porch.

Sylvia lived in a house behind the house in which the victim lived and in which she was shot; there was a common backyard between the two houses. Her testimony is that, around 10:00 p.m., Torres and the victim left Big Maria's house and came to her house. Sylvia had seven children, and there were also other young people visiting there on the night before the shooting.

One of the children visiting at Sylvia's house that night was Jessica Urrabazo. She was eleven years old at the time the victim was shot and thirteen years old at the time of trial. She testified that she was spending the night at Sylvia's on the night before the victim was shot. When Torres came to Sylvia's house, he had a gun with him. The gun was silver and black and looked "like an officer's gun." He was showing the gun off and tried to get the children to touch it. One of them did touch the gun. He also took the clip out of the gun and showed the bullets to the children. He continued to do that even after the victim told him to put the gun away.

Later in the evening, Torres and the victim went back to Big Maria's house. Torres testified that he carried the pistol in his "waistline" when he went back and forth from Sylvia's house to the victim's house.

Big Maria testified that she went to sleep about 12:30 a.m. When she went to bed, Torres and the victim were in the living room. Later, Big Maria got up to be sure that "everything was locked." Torres was sitting on a couch in the living room, and the victim was lying down on it. Torres had a chrome and silver handgun in his hand, took a bullet out of it, cleaned the bullet with his shirt, put the bullet back in the clip, and put the gun in a drawer by the couch.

The next time that she saw Torres and the victim, Torres was lying on the couch and the victim was asleep on the floor next to the couch. Later, shortly before 4:00 a.m., Big Maria and Alvarez got out of bed and walked out of the bedroom. When Big Maria opened the refrigerator, she noticed a "curtain flying in the living room." Big Maria asked Alvarez to see what was happening. He turned on the light, and she noticed that the front door was open and that the victim was lying on the floor by the couch where Big Maria had seen her sleeping earlier. Alvarez looked for Torres, but Torres was gone. He saw that the victim was lying on the floor "on her side and her stomach face down" in a pool of blood. He realized that she was dead.

Big Maria went to Sylvia's house, and Sylvia called 9-1-1 around 4:00 a.m. Sergeant James Young with the Abilene Police Department and other officers responded. When Sergeant Young arrived at the scene, he saw the victim lying on the floor with a large amount of

4

blood around her head and on the floor. It was Sergeant Young's opinion that the victim was dead. EMTs also came to the scene. They detected no vital sign activity, and they left.

At the time of the shooting, Detective John Reid was the Sergeant Supervisor in the Crimes Against Persons Unit in the Abilene Police Department. He and other law enforcement personnel gathered evidence at the scene. That evidence included clothing and a shell casing. Detective Reid testified about the blood flow patterns, as well as the absence of blood flow patterns, that he observed on and around the victim's body and clothing. He did not notice any bloodstains on the victim's pants, legs, or feet that would show a "downward directionality" of the victim's blood. The blood flow was horizontal, not vertical as it would have been had the victim been in an upright position. It was his expert opinion that the victim was not in a sitting or standing position when she was shot; she was lying down.

Detective James David Atkins, a twenty-two year veteran of the Abilene Police Department, and Detective Will Ford, a twenty-four year veteran of the Abilene Police Department, went to talk to Torres at around 6:45 a.m. He was at his parents' house some three blocks away from the house in which the victim was shot. Detective Ford was the lead investigator and conducted an interview with Torres at the Law Enforcement Center.

After Detective Ford interviewed Torres, Detective Tatum and Detective Atkins went to Torres's parents' house and, with Torres's parents' consent, searched the property. Other law enforcement officers joined in the search. During the search, the officers found the clothing that Torres had worn at the time of the shooting; some of the clothing was found on the washing machine or dryer, and some behind it. Also, certain items of clothing had blood on them.

When the officers searched outside the residence, they found the pistol used in the shooting; it was under a shed in the backyard. The clip was found stuffed under a cushion on a couch or loveseat in the backyard. There was a live round in the chamber of the pistol and six rounds in the clip.

After the interview with Torres and after the authorities found the evidence mentioned, they arrested him.

Carolyn Van Winkle, the crime lab quality manager and senior DNA analyst in the Tarrant County Medical Examiner's office, testified that she received Torres's shirt, denim shorts, white ankle socks, and a left Jordan athletic shoe from Detective Will Ford. She also received these four "swabbings" from a gun: the barrel end of the slide, the trigger, the grips,

5

and the slide groups. Additionally, she received the victim's DNA as well as a DNA sample obtained from Torres.

Van Winkle performed DNA tests upon the items. She found the victim's DNA on the denim shorts, the shoe tongue, and one of the socks. She testified that the probability of selecting an unrelated individual at random that would have the same profile as in the samples, and that would be Southwest Hispanic, would be approximately 1 in 1.2 quadrillion.

The swab from the barrel end of the slide tested positive, presumptively, for blood. The swabs obtained from the trigger, grips, and slide did not test positive for blood, but Van Winkle generated DNA profiles from them. She found the victim's DNA, Torres's DNA, and some "alleles" that could be attributed to neither the victim nor Torres on the trigger swab and the grips swab. The major DNA profile on the slide swab was the victim's. The probability of selecting an unrelated person, at random, who would have the same DNA profile as the victim, as shown from the slide swab, would be approximately 1 in 292 billion among Southwest Hispanics.

Clayton Daniels, Abilene Police Department criminalist officer, examined the pistol and the clip and found no readable, useable fingerprints on either.

Richard Ernest was the leader of the firearms section of the Tarrant County Medical Examiner's Crime Laboratory at the time of this shooting. He examined various items that he received from the Abilene Police Department, including a Walther P99, 9 mm, the handgun believed to have been used when the victim was shot. Ernest performed various tests, including tests on bullets that he fired from that handgun, and made comparisons with the shell casing found at the scene and with the bullet found in the victim's brain at autopsy. Ernest's expert opinion was that the shell casing was fired from the chamber of the Walther and that the bullet obtained at autopsy was fired from it also. Both of those results were to the exclusion of all others.

Dr. Marc Krouse had been with the Tarrant County Medical Examiner's Office since 1978; he was the Chief Deputy Medical Examiner. Dr. Krouse performed an autopsy on the victim's body. The only injury he found was a gunshot wound in the face; the bullet was still in the victim's head. The bullet hit her in the left eye at the place where the upper and lower eyelids join. The bullet tracked very slightly from left to right, almost straight. The track top to bottom was "pretty flat." Dr. Krouse noted a dense area of gunpowder stippling and tattooing

6

around the bullet wound.  He explained that, when a handgun is fired, some of the powder that comes out is either burning or unburned and is traveling as fast as the bullet, if not faster.  If the powder hits the skin and falls off, then it is classified as "stippling."  If the powder embeds in the skin, it is called "tattooing."  In the autopsy, Dr. Krouse found well-defined areas of stippling as well as tattooing.  The area in which stippling occurred was about a four-by-five inch area.  He found tattooing in a two and one-half inch area around the wound.  The implication is that the shot in this case was fired at close range.  Ernest told the jury that, based upon this type of stippling and tattooing, it was his opinion that the shot was fired at a distance of less than one foot – "somewhere in the range of about six to eight inches, nine inches."

Torres testified at trial.  He went to Big Maria's house after he got off work.  He and the victim talked neither about her being pregnant nor about their breaking up; they did not argue.  Around 9:30 in the evening, Torres and the victim went to Sylvia's house.  Torres played an Xbox game with someone there.  He had the handgun with him when he went to Sylvia's; he was carrying it in his "waistline."  He did not bring the gun to Big Maria's; he got it from Alvarez after he got there.  Contrary to Urrabazo's testimony, Torres denied ever showing the pistol to any of the children who were at Sylvia's.

Torres testified that, about 10:00 or 10:30 in the evening, Sylvia told the children that they were being too loud.  Torres and the victim went back to Big Maria's house.  Alvarez and Big Maria were in their room.  Torres and the victim had sex in the living room at around 11:00 or 11:30.  Afterwards, he was lying on the couch and talking to the victim who was sitting on the couch.  He had placed the gun in the drawer by the couch.  It was the same drawer where Torres said he had originally found the gun.  There was also a Glock 40 in the drawer, and at some point in time, Alvarez came into the living room, got the Glock, and took it to the bedroom with him.  Alvarez testified that he had no guns in the house but that he had seen Torres with the pistol.

While he was lying on the couch and the victim was sitting on the couch, Torres heard the gun load.  When he heard the gun load, he got up and saw the victim with the gun in her hand.  He took the gun away from her, took the clip out, cocked the gun to eject the bullet, put the ejected bullet back in the clip, put the clip back in the pistol, and put the pistol back in the drawer.  He lay back down on the couch.  Later, Torres heard the victim get up to get a drink and then she sat back down at the end of the couch.  Torres turned around and saw that the victim had the gun again.  She was still sitting on the couch, and Torres was sitting on the couch on the

7

victim's right side. This time, the victim was playing with the pistol. She was taking the clip out. Torres did not hear her get the gun this time, "something told me to turn around." He grabbed the pistol by the grip with the barrel pointed toward the victim, and he took the gun away from her again. But, he said, this time she tried to get the pistol back, and it went off and hit her in the head.

Torres also testified that he panicked and ran to his parents' house. He hid the pistol and the clip in the places where the police found them.

Alice Pena Rodriguez is Torres's mother. She lived about three or four blocks from where the victim lived. Torres came to her house around 1:30 a.m. He told Alice that the victim was "tripping" and that he left. Although she did not know what that meant, she assumed that the victim was "yelling at him or something." Torres wanted his mother to take him to pick up Merlinda.

Merlinda's mother, Juanita Deleon, testified that Merlinda woke her up about 1:40 a.m. and said that Torres had phoned. He had told Merlinda that the victim had shot herself.

Merlinda testified that, although Torres was acting normally when he picked her up, he was acting in a way she had never seen him act after they went to his parents' house. He appeared to be scared and nervous. Torres was sweating and did not want anyone to turn on the lights or watch television. He kept asking about traffic and who was driving by.

Merlinda heard an ambulance about 4:00 a.m. Torres had gone to sleep by that time, but he woke up when the police came for him about 7:00 a.m.

When the police interviewed Torres, he at first told them that he was already on the way to his parents' house when he heard a gunshot. Torres admitted at trial that he had lied about that and that what had really happened was that he had tried to take the gun away from the victim, she tried to get it back, it discharged and killed her. Torres had known the victim all of her life. He was seventeen years old; she was sixteen.

The only contest in the evidence is whether Torres shot the victim or whether the pistol went off while Torres and the victim struggled over it. The jury was free to infer Torres's intent or knowledge from any facts that tend to prove the existence of intent or knowledge. The jury could consider Torres's acts, words, and conduct in making its decision. It could also consider the method used to commit the crime as well as the nature of wounds inflicted on the victim. *Hart*, 89 S.W.3d at 64. The expert testimony is that the victim was not sitting up but, rather,

lying down when she was shot in the left eye. The trajectory of the bullet as well as the testimony about stippling and tattooing support that conclusion. The jury was the judge of the weight and credibility of the evidence. It was free to accept or reject Torres's position. It is apparent that the jury rejected it.

Under the standard of review that we have previously set forth and based upon the evidence that we have discussed, we hold that a rational trier of fact could have found the essential elements of the crime of murder beyond a reasonable doubt. The evidence is sufficient to support the verdict of the jury that Torres committed the offense of murder by intentionally or knowingly causing the death of the victim by shooting her with a handgun. Torres's second and third issues are overruled.

In his first issue, Torres asserts that the trial court erred when it denied his requested jury charge on the lesser included offense of criminally negligent homicide.

There is a two-pronged test to be used to determine when a lesser included offense must be included in the jury charge when requested by a defendant. First, the lesser included offense must be included within the proof necessary to establish the offense charged. Second, some evidence must exist in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty *only* of the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993); *Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).

If evidence from any source raises the issue that a lesser included offense may have been committed and the issue is properly requested, the charge must be given. *Moore v. State*, 574 S.W.2d 122, 124 (Tex. Crim. App. 1978). A defendant is entitled to an instruction on every issue raised by the evidence, whether produced by the State or the defendant, regardless if it is strong, weak, unimpeached, or contradicted. *Thompson v. State*, 521 S.W.2d 621, 624, (Tex. Crim. App. 1974).

The first prong of the *Royster-Rousseau* test is met in this case. Criminally negligent homicide is a lesser included offense of the offense of murder. *Thomas v. State*, 699 S.W.2d 845, 847 (Tex. Crim. App. 1985).

"A person commits an offense if he causes the death of an individual by criminal negligence." Section 19.05(a).

Criminal negligence is defined as follows in Section 6.03(d):

A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct

9

when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

The difference between murder and criminally negligent homicide lies in the different culpable mental states required in each offense. The culpable mental state for murder under Section 19.02(b)(1) is that, to be guilty of that offense, one must knowingly and intentionally cause the death of an individual. Section 19.02(b)(1). The court in *Thomas*, in order to better understand and explain whether the evidence raised criminally negligent homicide, compared the culpable mental states required for involuntary manslaughter and for criminally negligent homicide. *Thomas*, 699 S.W.2d at 849. The court discussed the fact that recklessness is the culpable mental state required for involuntary manslaughter, while criminal negligence is the culpable mental state required for criminally negligent homicide. *Id.* The court noted that there is a difference in risk awareness when reckless conduct is compared to criminally negligent conduct. *Id.* The court quoted from *Lewis v. State*, 529 S.W.2d 550, 553 (Tex. Crim. App. 1975), and said that reckless conduct involved:

[C]onscious risk creation, that is, the actor is aware of the risk surrounding his conduct or the results thereof, but consciously disregards that risk. Criminal negligence . . . involves inattentive risk creation, that is, the actor ought to be aware of the risk surrounding his conduct or the results thereof. At the heart of reckless conduct is conscious disregard of the risk created by the actor's conduct; the key to criminal negligence is found in the failure of the actor to perceive the risk.

The only evidence in this case that Torres claims raises the issue of criminally negligent homicide is his own testimony. His claim is that the shooting was an accident. First of all, accidental discharge alone does not raise the issue of criminally negligent homicide. *Thomas*, 699 S.W.2d at 850. In our review, we are required to examine the facts and circumstances of this case to determine whether Torres was unaware of the risk that his conduct created. *Id.*

The evidence showed that Torres had been carrying the pistol around in his waistband. The evidence also showed that he had taken the clip out of the pistol numerous times. He had also removed bullets from it and put them back into the clip. Prior to the time that the victim was shot, Torres testified that he had taken the gun away from the victim, cocked the gun back to eject a live round from the chamber, put the round into the clip, put the clip back in the gun, and

put the gun back into the drawer next to the couch. These actions show that Torres was familiar with pistols, at least with this one. As an indication of his awareness that pistols were dangerous, when Torres first took the pistol away from the victim, he took the bullet out of the chamber. By taking the pistol away from her the second time, he exhibited that same awareness. As far as whether he knew that a bullet was or was not in the chamber, he knew that, according to his testimony, she had put a bullet in the chamber earlier and he had taken care to eject it. We believe that all of this testimony showed that Torres was not one who simply failed to see the risk involved. There is nothing in this record that would allow a rational jury to find that, if the defendant is guilty, he is guilty *only* of the lesser offense of criminally negligent homicide and not guilty of the greater offense of murder. The trial court did not err when it refused to submit a charge on criminally negligent homicide. Torres's first issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT
CHIEF JUSTICE


June 2, 2011

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel[3] consists of: Wright, C.J.,
McCall, J., and Hill, J.[4]

---

[3]Rick Strange, Justice, resigned effective April 17, 2011. The justice position is vacant pending appointment of a successor by the governor.

[4]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.