**AFFIRM; and Opinion Filed January 23, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-01372-CR

### AKEEM PARRILLA, Appellant
### V.
### THE STATE OF TEXAS, Appellee

### On Appeal from the 366th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 366-81285-2011

## OPINION

Before Justices FitzGerald, Lang, and Lewis
Opinion by Justice Lewis

Appellant Akeem Parrilla was charged by indictment with nine counts of injury to a child, a first degree felony. Parrilla pleaded not guilty, waived his right to a jury trial, and proceeded to a trial before the court. The trial court convicted Parrilla on all counts and assessed punishment at eight years confinement in the Texas Department of Criminal Justice, Institutional Division. In one issue on appeal, Parrilla challenges the sufficiency of the evidence to support his convictions for injury to a child. We affirm the trial court's judgment.

## BACKGROUND

On March 8, 2011, Parrilla and Gabrielle Lynch brought their seven-week-old son, A.P., to the emergency room at Texas Health Presbyterian Plano Hospital with concerns about his right leg. The parents told hospital personnel that when Lynch was doing stretching exercises

with the infant, his right leg moved abnormally up toward his chest. Presbyterian Plano emergency room physician Brad Sellers examined A.P. and ordered an x-ray of his leg. Upon review of the x-ray, Sellers determined A.P. had suffered a mid-shaft femur fracture, transverse. The x-ray alerted Sellers to the possibility of abuse because, given the significant force necessary to break a femur, such a fracture is not typically an accidental injury. Based on the swelling, bruising, and the way A.P. reacted during examination, Sellers believed the injury had occurred recently—possibly three or four hours before A.P. was brought to the hospital. Dr. Sellers ordered A.P. transferred to Children's Medical Center (CMC) for specialized pediatric treatment and investigation as a suspected child abuse case.

At CMC, a team specializing in pediatric child abuse discovered the full extent of A.P.'s injuries. A skeletal survey revealed that A.P. had thirty-six broken bones. Dr. Amy Barton testified that A.P. had suffered a broken right femur, breaks in his right tibia, broken right radius, broken left ulna, broken left humerus, broken left radius, broken left femur, broken left tibia, and twenty-seven broken ribs. In addition to the thirty-six broken bones, Barton observed that A.P. had bruising around the front of his neck, on his abdomen, and on the back of his left thigh. Finally, A.P. had fluid in his lungs, which Barton said was a typical response to rib trauma.

Barton testified regarding the different types of fractures suffered by A.P., and explained how each type was caused. The fracture that brought A.P. to the emergency room was a break directly across his femur; the bone was actually broken apart. Barton testified it would take a severe traumatic event for a bone like this to break. Such a fracture tends to result from direct blunt force impact to the leg. She explained that both femurs, the right radius, and the right tibia contained metaphyseal corner fractures, which are the result of rapid back and forth movement of the limb, i.e., shaking or throwing. The rib fractures were caused by squeezing, and that damage to the ribcage could have caused the fluid in A.P.'s lungs. Injuries on the left side of

A.P.'s body—his left tibia, left ulna, and left humerus—involved buckle fractures which result from impact to the extremity (i.e., the foot, hand, or elbow) that is so sharp, the force goes up the bone and causes it to buckle on itself. When asked how the buckle fractures might have been inflicted, Barton testified that A.P.'s injuries were similar to cases she had in the past in which a perpetrator confessed to throwing an infant. The manner in which the infant landed could cause a buckle fracture.

Barton also explained that x-rays of the broken bones give some indication of when the injuries occurred, based upon the presence of signs of healing. She was able to determine that the rib fractures occurred more than fourteen days before the x-rays were taken. She was also able to determine that both femur fractures occurred less than seven to ten days before the x-rays were taken. Similarly, none of the arm and lower leg fractures showed signs of healing at the time of the x-rays. Thus, Barton concluded that A.P. sustained at least two separate assaults. She described A.P.'s injuries as serious bodily injury and said they could not have been inflicted accidentally. Barton testified that whoever caused these injuries would have known that they were creating pain and distress for this child, and it would have been obvious that he was in pain.

Marisa Ballew, an investigator for the Texas Department of Family and Protective Services (CPS), was the primary investigator assigned to this case. She testified that this case was reported to CPS as a priority one, requiring a response within twenty-four hours. She testified that Parrilla and Lynch were first interviewed by Kelly Mitchell, the CPS night investigator, to obtain information regarding the injury to their child. Parrilla and Lynch told Mitchell they did not know how their child was injured and both suggested that A.P. might have been injured when he was left in the care of some of the couple's friends. However, Parrilla and Lynch gave conflicting stories. Lynch told Mitchell four female friends came over to their house at 6 p.m. to watch A.P. while the couple went to McDonald's for a few minutes. Lynch did not

–3–

identify the friends. She stated no other children were in the home while they were gone. Parrilla told Mitchell that two female friends, two other friends (boyfriend and girlfriend), and two children came over at 3 p.m. to watch A.P. while the couple went to Wing Stop. Parrilla claimed the people were Chamara, Jatasha, Jamar, and Shaniqua.

Ballew interviewed Parrilla and Lynch the following day, after learning the extent of A.P.'s injuries. Lynch told Ballew that the baby cried a lot and she had trouble making him eat. Lynch did not appear to be surprised when told about the number of injuries the baby had sustained. When asked how the injuries happened, Lynch repeated her speculation that A.P. might have been injured when he was left in the care of their friends. However, Lynch's statement to Ballew differed somewhat from the statement she had given to Mitchell. Lynch told Ballew that their friends came over at 2 or 3 p.m. and stayed until 6 or 7 p.m. Ballew learned that both parents were unemployed and were the primary caregivers for their baby. Ballew learned that Lynch was home with the baby all of the time; Parrilla was home the majority of the time. Both Parrilla and Lynch admitted that there might have been a minor incident or two of domestic violence. However, neither parent admitted ever hurting A.P. Despite being the primary caregivers, neither Parrilla nor Lynch provided a plausible or consistent explanation for A.P.'s injuries. Ballew testified that CPS ultimately concluded that Parrilla and Lynch were responsible for the physical abuse to A.P. CPS took custody of A.P. and placed him in a foster home. A.P. was later placed in the care of Vandas and Constance Lynch, Lynch's father and step-mother.

Detective Chris Jones investigates crimes against children for the Plano Police Department. Jones testified that he received a CPS report regarding A.P.'s broken leg. When he called the CPS investigator to discuss the report, he learned that the skeletal survey for A.P. revealed thirty-six fractures. After talking with Dr. Barton to obtain her opinion regarding A.P.'s

–4–

injuries, he contacted Parrilla and Lynch to come to the Children's Advocacy Center for an interview. Jones testified that Parrilla told him that friends came over during the afternoon and during their visit, Parrilla and Lynch left to get something to eat at Wing Stop. Parrilla told Jones that when they returned home, they noticed that A.P. was fussier than usual. When Lynch stretched A.P.'s leg, it went all the way to his chest in an unnatural position. At that point, Parrilla decided the child needed to go to the hospital. Parrilla did not have an explanation for what had happened to A.P. He told Jones that maybe his friends were responsible.

Jones then interviewed Lynch, who told him that the baby could have been hurt by their friends or possibly by her father and his wife, who had watched the child on two occasions. Jones interviewed Lynch's mother, Quintina James, and two of the friends Parrilla said were at the house the day A.P. was injured, Chamara and Jatasha. Jones came to the conclusion that the other two named friends did not exist. After interviewing a number of witnesses, Jones came to believe the couple's story was false. The couple was arrested on March 16, 2011.

Chamara Ingram testified that she and Lynch had been best friends for five years. Ingram testified she did not know Parrilla, had never met Lynch's son, and had never been to the couple's apartment. Ingram also testified that she knew her friend Jatasha Thomas had never been to the couple's apartment.

Parrilla and Lynch were both in jail while awaiting trial. The two exchanged a number of letters, and portions of those letters were admitted into evidence at trial. In letters written by Parrilla, he admitted lying to investigators, he admitted dropping the baby, he suggested new ways in which A.P. might have been injured, and he attempted to ensure Lynch told the same story in court.

On May 24, 2011, Parrilla was charged by indictment with nine separate counts of injury to a child. Each count alleged that Parrilla intentionally and knowingly caused serious bodily

injury to A.P., by "striking, throwing, twisting, swinging, or squeezing [A.P.], or by a manner and means unknown to the Grand Jury." Although the manner and means alleged in each count was the same, the injuries sustained by A.P. were listed in separate counts: (Count 1) causing A.P.'s ribs to fracture; (Count 2) causing A.P.'s right femur to fracture; (Count 3) causing A.P.'s left femur to fracture; (Count 4) causing A.P.'s right tibia to fracture; (Count 5) causing A.P.'s left tibia to fracture; (Count 6) causing A.P.'s right radius to fracture; (Count 7) causing A.P.'s left radius to fracture; (Count 8) causing A.P.'s left ulna to fracture; and (Count 9) causing A.P.'s left humerus to fracture. Parrilla and Lynch were co-defendants at trial. The trial court found Lynch not guilty of injury to a child, but guilty of two counts of endangering a child. The trial court found Parrilla guilty of nine counts of injury to a child. The court also made an affirmative finding that a deadly weapon [Parrilla's hands] was used during the commission of the offenses. Parrilla filed a motion for new trial, which was denied. Parrilla then filed a notice of appeal.

## APPLICABLE LAW

### Standard of Review

Appellant contends the evidence is insufficient to establish that he was the person who intentionally and knowingly injured A.P. We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Adames v. State*, 353 S.W.3d 854, 859 (Tex. Crim. App. 2011). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the witnesses'

credibility and the weight to be given their testimony and therefore, is free to accept or reject any or all evidence presented by either side. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008). We defer to the trial court's determinations of witness credibility and weight of the evidence, and may not substitute our judgment for that of the fact finder. *See Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Furthermore, direct and circumstantial evidence are treated equally. "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13.

### Injury To A Child

A person commits the offense of injury to a child if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission," causes serious bodily injury to a child. TEX. PENAL CODE ANN. § 22.04(a)(1) (West Supp. 2013). "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (West Supp. 2013). Injury to a child is a result-oriented offense requiring a mental state that relates not to the specific conduct, but to the result of that conduct. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Young v. State*, 358 S.W.3d 790, 802 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd). A person acts "intentionally" when it is his conscious objective or desire to engage in the conduct or cause the result. TEX. PENAL CODE ANN. § 6.03(a) (West 2011). A person acts

"knowingly" when he is aware that the conduct is reasonably certain to cause the result. *Id*. § 6.03(b).

In cases involving injury to a child, there is rarely direct evidence of exactly how the child's injuries occurred. *Williams v. State*, 294 S.W.3d 674, 683 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Instead, we look to rational inferences from circumstantial evidence to determine whether the State met its burden. *See id.* Intent can be inferred from the extent of the injuries to the victim, the method used to produce the injuries, and the relative size and strength of the parties. *Jackson v. State*, 399 S.W.3d 285, 291 (Tex. App.—Waco 2013, no pet.) (citing *Patrick v. State*, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995)). It can also be inferred from circumstantial evidence, such as acts, words, and appellant's conduct. *Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Ledesma v. State*, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984).

Parrilla does not dispute that A.P. suffered numerous injuries. The evidence is undisputed that when A.P. arrived at CMC, he had thirty-six broken bones, bruising around the front of his neck, on his abdomen, and on the back of his left thigh, and fluid in his lungs. We conclude the evidence was sufficient to support the trial court's finding that A.P. suffered severe bodily injury. *See Jackson*, 399 S.W.3d at 291–92.

Parrilla argues that the evidence at trial was insufficient to prove that he was the person responsible for intentionally and knowingly causing A.P.'s injuries. Parrilla also argues there is no circumstantial evidence by which such a culpable mental state could be attributed to him. Instead, he suggests that circumstantial evidence exists to infer that Lynch intentionally and knowingly injured the child. According to the record, CPS determined that Parrilla was unemployed and at home with the child most of the time. CPS also determined that Parrilla was a primary caregiver for the child. Additionally, the evidence revealed at least one incident of

domestic violence between Parrilla and Lynch, and Parrilla admitted assaulting Lynch. "The identity of the perpetrator of an offense can be proven by direct or circumstantial evidence." *Martin v. State*, 246 S.W.3d 246, 261 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (citing *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986)). Despite the circumstantial nature of the evidence, the trial court could have reasonably inferred that Parrilla was the person who injured A.P. *See Martin*, 246 S.W.3d at 262; *Courson v. State*, 160 S.W.3d 125, 128 (Tex. App.—Fort Worth 2005, no pet.).

The evidence is clear that Parrilla consistently lied about the source of A.P.'s injuries. When weighing circumstantial evidence, the trial court could have considered Parrilla's untruthful statements as affirmative evidence of guilt. *See Gear v. State*, 340 S.W.3d 743, 747 (Tex. Crim. App. 2011); *Padilla v. State*, 326 S.W.3d 195, 201 (Tex. Crim. App. 2010) (rational fact finder can consider defendant's untruthful statements, in connection with other circumstances of the case, as affirmative evidence of defendant's guilt). The record reflects that Parrilla lied about friends coming to their home and watching A.P. while Parrilla and Lynch went to Wing Stop. Even if friends had been at the house on March 8, 2011, they could not have been responsible for the injuries to A.P.'s ribs, which already showed signs of healing. Jones testified that he did not believe Parrilla's story concerning what happened to A.P. because— given that the injuries had occurred in at least two separate incidents—he found it unlikely that different people outside the home would have caused severe injuries on two different occasions. Parrilla told investigators he did not know how A.P. was injured. However, in letters written from jail, Parrilla admitted dropping the child. Parrilla also suggested that A.P. might have sustained some of his injuries while in bed with Parrilla and Lynch. Barton testified that A.P.'s injuries were not accidental. Barton testified the injuries were so severe that the person inflicting the injuries would have known he was hurting the child, and it would have been obvious that

A.P. was in pain. The trial court could have inferred intent from Parrilla's acts and words, as well as the surrounding circumstances. *See Guevara*, 152 S.W.3d at 50; *Ledesma*, 677 S.W.2d at 531.

It was the trial court's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Isassi*, 330 S.W.3d at 638. Viewed in the light most favorable to the verdict, we conclude the evidence is sufficient to support the trial court's findings that Parrilla intentionally or knowingly caused serious bodily injury to A.P. Accordingly, we overrule Parrilla's sole issue.

## CONCLUSION

Having decided Parrilla's sole issue against him, we affirm the trial court's judgment.


/David Lewis/
DAVID LEWIS
JUSTICE


Do Not Publish
Tex. R. App. P. 47

121372F.U05

–10–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

AKEEM PARRILLA, Appellant

No. 05-12-01372-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 366th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 366-81285-2011.
Opinion delivered by Justice Lewis.
Justices FitzGerald and Lang participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 23rd day of January, 2014.


/David Lewis/
DAVID LEWIS
JUSTICE