# NO. 12-14-00101-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *BILLY WAYNE HASEL,*<br>*APPELLANT* | *§* | *APPEAL FROM THE 3RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | *§* | *ANDERSON COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Billy Wayne Hasel appeals his convictions for capital murder and injury to a child. He raises one issue regarding the sufficiency of the evidence for each conviction. We affirm.

## BACKGROUND

An Anderson County grand jury returned a three count indictment against Appellant for the offenses of capital murder, murder, and injury to a child. Appellant pleaded "not guilty" to each of the three counts, and a jury trial was held. The jury found Appellant guilty of capital murder and injury to a child. Because the State did not seek the death penalty, Appellant was automatically sentenced to life without parole for the capital murder offense.[1] The trial court assessed Appellant's punishment for the injury to a child offense at twenty years of imprisonment, to run concurrently with his capital murder sentence. This appeal followed.

---

[1] *See* TEX. PENAL CODE ANN. § 12.31 (West Supp. 2014)

In his sole issue, Appellant challenges the sufficiency of the evidence and argues that his convictions are "based upon no more fact than he was present during the injury, and thus had the culpable mental state to effect murder or injury to the child."[2]

**Standard of Review**

When sufficiency of the evidence is challenged on appeal, we view all of the evidence in the light most favorable to the verdict to decide whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). We defer to the trier of fact's responsibility to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789. A jury is permitted to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Id.* Thus, in applying the *Jackson v. Virginia* standard, we determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict. *See Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012).

The sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the state's burden of proof or unnecessarily restrict the state's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

As set forth in count I of the indictment, the State was required to prove beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of Deacon Jack Garay, causing blunt force trauma by his hands, feet, an object, or in an unknown manner and

---

[2] Appellant also argues that the evidence is factually insufficient to support the jury's findings. "We do not review the factual sufficiency of the evidence to support a jury's finding on the elements of a criminal offense that the State is required to prove beyond a reasonable doubt." *Lucio v. State*, 351 S.W.3d 878, 895 (Tex. Crim. App. 2011).

means, and that Deacon Jack Garay was an individual younger than ten years of age. *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2011), § 19.03(a)(8) (West Supp. 2014).

As set forth in count III of the indictment, the State was required to prove beyond a reasonable doubt that Appellant intentionally or knowingly caused serious bodily injury or serious mental deficiency, impairment, or injury to Deacon Jack Garay by blunt force trauma using his hands, feet, an object, or in an unknown manner and means, and Deacon Jack Garay was a child fourteen years of age or younger. *See* TEX. PENAL CODE ANN. § 22.04(a) (West Supp. 2014).

**Applicable Law**

Capital murder and injury to a child are result oriented offenses. *See **Louis v. State***, 393 S.W.3d 246, 251 (Tex. Crim. App. 2012); ***Williams v. State***, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). When the State prosecutes a result oriented offense, it is not enough to prove that the defendant engaged in conduct with the requisite criminal intent. ***Lee v. State***, 21 S.W.3d 532, 540 (Tex. Crim. App. 1978). The State must also prove that the defendant caused the result with the requisite criminal intent. ***Id.*** Generally, this is proven by circumstantial evidence. *See **Dillon v. State***, 574 S.W.2d 92, 94 (Tex. Crim. App. 1978) (stating that proof of mental culpability generally relies on circumstantial evidence).

A person acts intentionally with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *See* TEX. PENAL CODE ANN. § 6.03(a) (West 2011). Intent may be inferred from the accused's acts, words, and conduct. ***Patrick v. State***, 906 S.W.2d 481, 487 (Tex. Crim. App. 1995). Intent may also be inferred from the extent of the injuries to the victim, and the relative size and strength of the parties. ***Id.***

A person acts knowingly with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. TEX. PENAL CODE ANN. § 6.03(b). The mental state of "knowingly" does not refer to the defendant's knowledge of the actual results of his actions, but knowledge of what results his actions are reasonably certain to cause. ***Howard v. State***, 333 S.W.3d 137, 140 (Tex. Crim. App. 2011). Knowledge may be inferred from the surrounding circumstances. ***Dunn v. State***, 13 S.W.3d 95, 98–99 (Tex. App.—Texarkana 2000, no pet.). And just as a jury may infer intent from the accused's act, words, and conduct, the jury may also infer knowledge. *See **id.*** In murder cases, evidence of a particularly brutal or ferocious mechanism of death, inflicted upon a helpless victim, can also be controlling on the issue of intent

or knowledge. ***Martin v. State***, 246 S.W.3d 246, 263 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Because Appellant's sole challenge concerns mens rea, we limit our discussion to factors supporting inferences of knowledge and intent. *See* TEX. R. APP. P. 47.1.

**Discussion**

On September 1, 2011, Appellant called Palestine EMS and reported that Deacon Jack Garay, his two-year-old stepson, fell off the first step of the stairs and was unconscious. When paramedics Nathan Cole and Andrea Stapleton arrived, they saw Deacon lying on the floor, unresponsive, and in "very critical" condition. His chin was tucked down to the right, his feet were pointed down, and he was "posturing."[3] His neck and arms were stiff and his pupils were unequal and nonresponsive. All of these signs indicated that Deacon had suffered a brain injury.

*Deacon's Injury*

Shilite Edwards was the charge nurse at Palestine Regional Medical Center when Deacon arrived at the emergency room. She did not see any contusions to the back of Deacon's head, or any lacerations, discoloration, or blood anywhere else on his head. However, another nurse, Meagan Linton Defrance, testified that she observed bruising on Deacon's arms and "side of his face."[4] She testified that Deacon was posturing, and had no reaction when intubated or stuck with the IV. Defrance also testified that Deacon's pupils indicated a "massive head injury," which was confirmed by a CT scan. A helicopter flew Deacon to Children's Medical Center in Dallas where he underwent neurosurgery that day.

Deacon was diagnosed with having a blood clot and hemorrhaging in his brain. The surgery and CT scans showed a "midline shift," which is known to cause alterations in breathing and consciousness, seizures, changes in pupils, and posturing. However, Deacon had no medical history of seizures or neurological disorders, bleeding disorders, or spontaneous bruising.

Dr. Matthew Cox, a physician at the University of Texas Southwestern Medical School and medical director of the Referral Evaluation of At-Risk Children (REACH) in Children's Medical Center, examined Deacon after his surgery. Dr. Cox testified that he saw bruises on Deacon's arm, hand, leg, and foot, which he found concerning. He also observed bruising on Deacon's head, but he could not determine the cause of the bruising because it could have been

---

[3] The record indicates that "posturing" is an involuntary motion that occurs as a result of a brain injury.

[4] Lori Webb, another nurse working in the emergency room when Deacon arrived, testified that she saw bruising on Deacon's arms and legs.

the result of his injury or of the surgery. Dr. Cox concluded that the "pattern [of Deacon's injuries] is not consistent with accidental injuries in the absence of a clear and consistent history of trauma, and the findings are consistent with inflicted injuries and child abuse."

Dr. Jeffrey Barnard, the chief medical examiner for Dallas County and director of the Southwestern Institute of Forensic Science, conducted Deacon's autopsy. The autopsy revealed that Deacon suffered from hemorrhaging located at the sides of his head, but no contusions to the back of his head.[5] Dr. Barnard did not believe Deacon hit the back of his head because there was no impact site in that area. He testified that the bruising he observed on the side of Deacon's head could either be evidence of treatment or evidence of the impact site. Dr. Barnard testified that if the bruise was there when Deacon was first seen, it would be a traumatic injury, correlating with a blunt force injury site.

Dr. Barnard's autopsy report stated that the "findings and circumstances are worrisome for non-accident trauma." Dr. Barnard believed Deacon died of blunt force injuries because an asymmetrical injury to the brain, such as Deacon had, indicates a blunt force injury. However, Dr. Barnard's conclusion as to Deacon's manner of death was "undetermined" because Deacon had undergone medical treatment, and he could not determine whether the bruising on his head occurred before or after medical treatment.[6]

*Appellant's Statements*

Appellant reported to EMS that Deacon fell approximately three feet off the first step in the apartment. He related a similar explanation to Deacon's mother and to Palestine police officer Marcos Lara. But he told paramedic Nathan Cole that Deacon fell over the banister and onto the floor.

Nurse Edwards testified that she heard Appellant explaining that Deacon acted like he was choking and arched his back and neck before falling down the stairs. Appellant gave a similar explanation to Investigator James Muniz the next day, stating that Deacon appeared to have a seizure before falling. When he spoke to CPS investigator Monica Cole, Appellant told her that Deacon acted "odd" the night before by "knock[ing] a cup of milk over several times and he spilled it on the remote control and other items and laughed about it." He told her that when

---

[5] Dr. Barnard also noted bruising on Deacon's tongue, left shoulder, right foot, base of right thumb, and lower left of his abdomen and flank area.

[6] Dr. Barnard testified that there are five manners of death: natural, suicide, homicide, accident, and undetermined.

Deacon was told not to do it again, Deacon responded by saying "what" several times. However, when Appellant spoke to Sergeant Larry Reeves, an investigator for the Inspector General's Office, he did not mention anything about Deacon's spilling milk or anything out of the ordinary happening the night before.

*Appellant's Conduct*

Officer Lara testified that Appellant was emotional and "pacing" in and out of the apartment while paramedics attempted to treat Deacon. Paramedic Andrea Stapleton testified that when they arrived, Appellant consistently talked over Deacon's mother and repeatedly said, "You can't let him die, he can't die, you can't let him die." Stapleton testified that she believed Appellant's attitude towards Deacon was "more callous than loving." She further testified that she overheard Appellant talking on his cellular phone saying "[i]f [Deacon] died, they were going to blame him."

The day after Deacon was admitted to Children's Hospital, Investigator Cole met Appellant at the apartment to gather clothing and belongings for Deacon's two oldest siblings. During this encounter, Appellant related that Deacon fell backwards and hit his head. Cole testified that she maintained a safe distance from Appellant during her meeting with him because he was a "very big guy" and she did not want to enter "his space." As she continued her conversation with him and talked about placing Deacon's older brothers in foster care, Appellant became increasingly agitated and "slapped" an ashtray that "went across the room towards the kitchen and in the room."

Sergeant Larry Reeves testified that he interviewed Appellant at Children's Medical Center in Dallas, and at his apartment. Sergeant Reeves testified that he noticed a broken ashtray near the couch in Appellant's apartment. Appellant told Reeves they broke the ashtray in a rush to get to the hospital the previous morning.

*Surrounding Circumstances*

Nurse Defrance testified that when she saw Deacon arrive at the emergency room on September 1, 2011, she "wondered why CPS hadn't removed [Deacon] from the home already." Defrance's surprise was due to her having treated Deacon on June 30, 2011, for a head injury he incurred while in his mother's and Appellant's care. The head injury consisted of a large bruise on the right side of Deacon's face and temple area. Deacon's father told Nurse Defrance that

Appellant was responsible for the injury.[7]  The trial court admitted photographs showing that the bruise went from Deacon's right temple up to his forehead, above his right eye.  Because the bruise was not consistent with a fall, Defrance notified law enforcement and CPS.

Marty Hollis was the CPS investigator who received the June 30 report alleging that Appellant abused Deacon by striking him in the head.[8]  Hollis interviewed Appellant, Deacon's parents, grandparents and siblings, and the manager of the apartment complex.  Due to the allegations and Deacon's visible injury, Hollis developed a safety plan that required Appellant to live apart from Deacon's mother and her three children.  However, Appellant moved back in, with CPS's permission, on July 18, 2011.

On July 28, 2011, Hollis conducted a visit of Appellant's home and noted a small abrasion on the left side of Deacon's forehead.  A photograph of Deacon's injury was admitted into evidence that actually showed two bruises.  Appellant told Hollis that Deacon bruised his head by running through the house and sliding into a wall.  Hollis testified that Deacon then pointed at his forehead and told him, "I hit my head."  Dr. Cox saw these photographs and testified that the bruising was inconsistent with Appellant's explanation.

On August 10, 2011, Hollis conducted another visit during which Appellant advised him that Deacon fell and cut his lip.[9]  But Appellant gave Deacon's mother a different explanation.  Appellant told Deacon's mother that he swung his arm back and hit Deacon in the lip when Deacon was walking closely behind him.

Martha Garay, Deacon's paternal grandmother, testified that after Deacon was injured on June 30, he never wanted to return to Appellant's home.  She stated that he would hide underneath the kitchen table when it would be time for him to return.

Lastly, Deacon's mother testified that Appellant "is OCD" and that he "does not like sticky at all."  She explained that once, when Appellant spilled a drink on himself, he cursed and "threw the kids' chair across the room."  She further testified that Appellant later told her that right before they went back upstairs (on September 1, 2011), he had gotten into a "fight" with

---

[7] Deacon's father related that he learned from his two older children that Appellant was responsible for the injury.

[8] At the time of trial, Hollis was no longer a CPS employee.

[9] Hollis did not see a visible injury, but medical records showed that Deacon had a "lip contusion" during that time period.

Deacon because Deacon had spilled his drink. He related that he "had got onto him to the point where [Deacon] was crying, and that was right before they went upstairs."[10]

**Conclusion**

It is undisputed that Deacon suffered hemorrhaging to the right side of his brain and none to the back of his head. Nurse Defrance's testimony about the bruising on the side of Deacon's face validated Dr. Cox's and Dr. Barnard's testimony that Deacon's injury was caused by blunt force trauma. Appellant does not challenge the sufficiency of the evidence proving that he engaged in conduct that caused Deacon's injury and death. *See Lee*, 21 S.W.3d at 540. His sole complaint is that the evidence is insufficient to show that he caused the result with the requisite criminal intent. *See id.*

Appellant's repeated exclamations that Deacon "couldn't die," his multiple versions of how Deacon was injured, his "callous" attitude, and his telephone conversation about being held responsible for Deacon's injury indicate a consciousness of guilt. This evidence, when viewed in light of Appellant's size, his causing Deacon's cut lip during an ongoing CPS investigation, his explosive behavior in response to having spilled a drink, and his later admission that Deacon spilled a drink on himself before going upstairs, supports a finding that Appellant was aware that his conduct (blunt force trauma) was reasonably certain to cause Deacon's injury and subsequent death. *See* TEX. PENAL CODE ANN. § 6.03(b); *Garcia*, 367 S.W.3d at 687.

After viewing the evidence in the light most favorable to the verdict, we conclude that a rational jury could reasonably infer that Appellant knowingly caused Deacon's injury and subsequent death. *See Garcia*, 367 S.W.3d at 687. The evidence is legally sufficient to support Appellant's convictions for capital murder and injury to a child. Accordingly, we overrule Appellant's sole issue.

**DISPOSITION**

Having overruled Appellant's sole issue, we ***affirm*** the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered June 17, 2015.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*
(DO NOT PUBLISH)

---

[10] During one of his interviews with Sergeant Reeves, Appellant related that Deacon "got choked" on a drink and spilled some of it onto his chest, but Deacon told him he was okay.

8



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

JUNE 17, 2015

NO. 12-14-00101-CR

**BILLY WAYNE HASEL,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

---

Appeal from the 3rd District Court

of Anderson County, Texas (Tr.Ct.No. 31066)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, for which execution may issue, and that this decision be certified to the court below for observance.

Brian Hoyle, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*